RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0355p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JEFFREY SWIECICKI,

*Plaintiff-Appellant,*

*v.*

JOSE DELGADO,

*Defendant-Appellee.*

No. 05-4036

>

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 03-02571—Lesley Brooks Wells, District Judge.

Argued: May 31, 2006

Decided and Filed: September 15, 2006

Before: GILMAN, SUTTON, and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Stephen W. Gard, Cleveland, Ohio, for Appellants. Thomas R. Wolf, REMINGER & REMINGER, Cleveland, Ohio, for Appellee. **ON BRIEF:** Stephen W. Gard, Cleveland, Ohio, for Appellants. Thomas R. Wolf, REMINGER & REMINGER, Cleveland, Ohio, for Appellee.

GILMAN, J., delivered the opinion of the court, in which COOK, J., joined. SUTTON, J. (pp. 14-17), delivered a separate opinion concurring in part, concurring in the judgment in part and dissenting in part.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. While attending a Cleveland Indians baseball game, Jeffrey Swiecicki, along with several of his friends, loudly cheered for some players and heckled others. Officer Jose Delgado, an off-duty police officer for the City of Cleveland, was in full uniform and working for the ballpark as a security guard. He allegedly heard Swiecicki using profane language. Delgado asked Swiecicki to halt his behavior or leave the stadium. When Swiecicki did not respond, Delgado placed Swiecicki in the "escort position" and began leading him out of the bleachers. In the course of leaving the stadium, Delgado arrested Swiecicki and wrestled him to the ground. Swiecicki was later charged with and convicted of disorderly conduct and

1

resisting arrest, but his convictions were overturned on appeal. *See City of Cleveland v. Swiecicki*, 149 Ohio App. 3d 77, 82 (Ohio Ct. App. 2002).

He subsequently filed an action in federal district court pursuant to 42 U.S.C. § 1983, alleging that Delgado had violated his constitutional rights by arresting him based on the content of his speech, had effectuated the arrest without probable cause, and had used excessive force during the arrest. Swiecicki also raised various state-law claims. The district court granted summary judgment to Delgado, holding that the statute of limitations had run on Swiecicki's excessive-force claim, that Delgado was entitled to qualified immunity on the remaining federal claims, that he was entitled to judgment as a matter of law on the state-law claim of malicious prosecution, and that Swiecicki's other state-law claims should be dismissed without prejudice. For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

On September 25, 2001, Swiecicki and several of his friends attended a Cleveland Indians baseball game at Jacobs Field. During the game, Swiecicki heckled members of both teams, particularly those playing the left field position, and consumed two beers.

At all relevant times, Delgado, a City of Cleveland police officer, was working as a security guard and was stationed at a tunnel near the bleachers where Swiecicki and his friends were seated. Delgado was officially off-duty, but he was wearing his police uniform with his badge and was carrying the weapons issued by the police department. Wilfred Labrie, a host greeter for Jacobs Field, was assigned to a section near Delgado. Both of these men were hired to provide assistance and to monitor the fans' behavior.

In conjunction with Gateway Economic Development Corporation (Gateway), the owner of Jacobs Field, the Indians promulgated various rules and regulations to govern fan behavior. The rule relevant to the present case provides as follows:

> *Fan Behavior*: Persons using obscene or abusive language, or engaging in any other antisocial conduct offensive to those around them, will be asked by Cleveland Indians personnel to cease this conduct. If the offensive conduct persists, those involved will be subject to ejection from the ballpark.

Although the fan-behavior rule prohibits offensive or abusive language, no similar rule prohibits loud yelling, heckling, or booing. Swiecicki admits that he led a group of fans in various heckles and cheers. He also contends that "almost the entire bleachers were yelling."

Around the seventh inning, both Delgado and Labrie allegedly heard loud, profane language coming from the bleachers. Delgado claims that he heard Swiecicki yell "Branyon, you suck" and "Branyon, you have a fat ass." Swiecicki admits to loud heckling, but denies that he used profane language. Although Swiecicki also denies that he was intoxicated, Delgado contends that he saw Swiecicki with a beer in his hand at the time of the offensive comments. Labrie, however, testified that neither the bleachers nor Swiecicki were directly visible from where Labrie and Delgado were stationed.

Based upon Delgado's perception of Swiecicki's comments and realizing that Swiecicki might be intoxicated, Delgado approached Swiecicki and told him to "cut it out." Swiecicki did not respond. Although no fan specifically requested that Delgado take action to stop Swiecicki's behavior, Delgado alleges that a man with a young daughter later thanked Delgado for asking Swiecicki to lower his voice. After again motioning to Swiecicki to halt his behavior with no success, Delgado told Swiecicki: "We can either do this the easy way or the hard way." Swiecicki

then approached Delgado. Delgado moved toward Swiecicki, grabbed his arm and shirt to place him into the "escort position," and led him towards the tunnel to exit the stadium.

While Delgado was escorting Swiecicki through the tunnel, Swiecicki asked Delgado "on more than 10 occasions" what he had done to prompt Delgado's actions. Delgado provided no response. Swiecicki's brother Scott, along with three other men, began to follow Delgado, also asking Delgado what Swiecicki had done wrong. At this point, Delgado alleges that Swiecicki jerked his arm away to break from Delgado's grasp. Swiecicki denies any physical resistance. Delgado then used an "arm bar" and wrestled Swiecicki to the ground, with Swiecicki hitting his head on a door before falling to his knees. On the ground, Delgado pushed Swiecicki's face into the concrete and continued to apply pressure to his right arm despite Swiecicki's pained expression. Delgado then told Swiecicki that he was under arrest.

Swiecicki was later charged with aggravated disorderly conduct pursuant to Cleveland Codified Ordinance § 605.03 and with resisting arrest pursuant to Cleveland Codified Ordinance § 615.08. He was found guilty by the Cleveland Municipal Court of the lesser-included offense of disorderly conduct and of resisting arrest. The Ohio Court of Appeals, however, reversed his convictions based on insufficiency of the evidence. *See Swiecicki*, 149 Ohio. App. 3d at 82.

Swiecicki then filed the present suit in federal district court pursuant to 42 U.S.C. § 1983, alleging that Delgado had violated his constitutional rights by arresting him (1) based on the content of his speech in violation of the First Amendment, (2) without probable cause in violation of the Fourth Amendment, and (3) through the use of excessive force in violation of the Fourth Amendment. Swiecicki also accused Delgado of assault, battery, false imprisonment, and malicious prosecution, all in violation of Ohio law. The district court granted summary judgment in favor of Delgado, holding that qualified immunity acts as a complete bar to all of Swiecicki's federal claims. It also granted summary judgment to Delgado on the malicious-prosecution claim and dismissed the remaining state-law claims without prejudice for lack of jurisdiction.

## II. ANALYSIS

### A.     Standard of review

We review de novo the district court's grant of summary judgment. *Int'l Union v. Cummins*, 434 F.3d 478, 483 (2006). Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.     The statute of limitations as applied to Swiecicki's Fourth Amendment excessive-force claim

Swiecicki first argues that the district court erred in holding that his Fourth Amendment excessive-force claim was barred by the statute of limitations. The district court's determination is a question of law that we review de novo. *Wolfe v. Perry*, 412 F.3d 707, 713 (6th Cir. 2005) (reversing a district court's determination that the complaint was filed after the statute of limitations had run). Because Congress did not specify a statute of limitations for claims made pursuant to § 1983, we must borrow the statute of limitations governing personal injury claims in Ohio. *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003) (holding that "federal courts must borrow the statute of limitations governing personal injury actions in the state in which the section 1983 action was brought"). The appropriate statute of limitations in this case is two years. *See id.* When the

statute of limitations begins to run depends on the nature of the claim under § 1983. *Heck v. Humphrey*, 512 U.S. 477, 489 (1994) (holding that a § 1983 claim for malicious prosecution does not accrue "until the criminal proceedings have terminated in the plaintiff's favor").

Typically, the statute of limitations for filing an action based on excessive force begins to run at the time the injury is discovered, which in most cases is at the time of the arrest. If, however, a cause of action under § 1983 would necessarily imply the invalidity of the plaintiff's underlying criminal conviction, the statute of limitations does not begin to run until the underlying conviction is reversed or expunged. *Shamaeizadeh v. Cunigan*, 182 F.3d 391, 396 (6th Cir. 1999) (holding that the statute of limitations for a criminal defendant's § 1983 claim did not begin to run until the underlying criminal proceedings had concluded in his favor). Swiecicki filed his complaint on December 19, 2003, more than two years after his arrest but just over one year after his underlying convictions were reversed. The key inquiry, then, is whether Swiecicki's excessive-force claim pursuant to § 1983 would have implied the invalidity of his criminal convictions.

This court has previously held, in an unpublished decision, that a claim of excessive force does not necessarily relate to the validity of the underlying conviction and therefore may be immediately cognizable. *Hodge v. City of Elyria*, 126 F. App'x 222, 225 (6th Cir. March 3, 2005) (holding that the statute of limitations began to run at the time of arrest because "Hodge's conviction related to drug possession and tampering with evidence [was] wholly unrelated to excessive force."). The district court below seized on this holding and, with no further analysis, declared that Swiecicki's excessive-force claim was barred by the statute of limitations. What the district court failed to recognize, however, is that in order to determine whether the § 1983 claim would imply the invalidity of the offense, "the court must look both to the claims raised under § 1983 *and* to the specific offenses for which the § 1983 claimant was convicted." *Hughes v. Lott*, 350 F.3d 1157, 1161 n.2 (11th Cir. 2003) (emphasis added) (interpreting *Heck*, 512 U.S. at 487 n.6); *see also Heck*, 512 U.S. 487 n.6 (suggesting that the statute of limitations for a § 1983 claim based on an unreasonable seizure would not begin to run until the plaintiff's underlying conviction for resisting arrest had been overturned because, in order to prevail on his § 1983 claim, the plaintiff would have to negate an element of the particular offense for which he was convicted). *Hodge* is therefore not dispositive both because it is unpublished and because the underlying offenses in *Hodge* were unrelated to the claim of excessive force.

Cleveland's resisting-arrest ordinance provides that "[n]o person, recklessly or by force, shall resist or interfere with a lawful arrest of himself or another." Cleveland Cod. Ord. § 615.08. A conviction for resisting arrest thus requires that the underlying arrest be lawful. This court has held in an unpublished opinion that such a conviction necessarily includes a finding that the police officer did not use excessive force. *See White v. Ebie*, 1999 WL 775914, at *1 (6th Cir. 1999) (analyzing the relationship between a conviction for resisting arrest pursuant to the applicable Ohio statute and a claim of excessive force pursuant to § 1983). The *White* court relied on Ohio law, which provides that an arrest is not lawful if the arresting officer uses excessive force. *Id.*; *see also City of Columbus v. Fraley*, 324 N.E.2d 735, 740 (Ohio 1975) (*"[I]n the absence of excessive or unnecessary force by an arresting officer*, a private citizen may not use force to resist arrest by one he knows, or has good reason to believe, is an authorized police officer engaged in the performance of his duties. . . .") (emphasis added). We agree with *White's* analysis.

*White* and the Ohio rule of law on which it relies, then, suggest that Swiecicki's excessive-force claim under § 1983 would have necessarily implied the invalidity of his conviction for resisting arrest—thus indicating that the statute of limitations did not begin to run until Swiecicki's convictions were overturned. In *City of Cleveland v. Murad*, 616 N.E.2d 1116, 1120 (Ohio Ct. App. 1992), however, the Eighth District of the Ohio Court of Appeals, which includes Cleveland, limited the rule announced in *Fraley* to cases in which the excessive force by the arresting officer occurred *prior* to the suspect's resistance. Because the suspect in *Murad* admitted that he "resisted arrest so

forcefully that it took three officers and a civilian to subdue him," the court concluded that the suspect "himself was the cause of the force used in his arrest." *Id.*

The *Murad* court thus upheld the suspect's conviction for resisting arrest, rejecting the argument that his resistance preceding the force used to arrest him was justifiable. *Id.*; *see also City of Columbus v. Purdie*, Nos. 84AP-127 & 84AP-128, 1984 Ohio App. LEXIS 11679, at *8-9 (Ohio Ct. App. Nov. 29, 1984) (unpublished) (upholding a defendant's conviction for resisting arrest where "the use of force [by police] *was in response to* the conduct of defendant") (emphasis added). In other words, *Murad* implies that in some cases a resisting-arrest conviction may stand even if excessive force was used after the suspect's resistance.

A synthesis of these cases indicates that we must consider the nature and extent, if any, of Swiecicki's resistance, paying particular attention to whether Swiecicki's alleged resistance occurred prior to the alleged use of excessive force by Delgado. If, as Swiecicki claims, Delgado's use of force was essentially unprovoked, the rule from *White,* 1999 WL 775914, at *1, provides that the statute of limitations did not begin to run until Swiecicki's convictions were overturned by the Ohio Court of Appeals. Ohio law, as interpreted by *White*, explicitly provides that a *lawful* arrest is a necessary element of a conviction for resisting arrest. *Id.* On that basis, Swiecicki's excessive-force claim pursuant to § 1983 would have necessarily implied the invalidity of his conviction for resisting arrest because if the amount of force used was unlawful, an essential element of the underlying offense for resisting arrest would have been negated. *See Heck*, 512 U.S. at 487 n.6 (explaining that a plaintiff cannot bring a § 1983 claim if he would have to negate an element of the underlying offense for which he has been convicted). The statute of limitations, under Swiecicki's version of the facts, therefore did not begin to run until the Ohio Court of Appeals invalidated his convictions.

On the other hand, if Swiecicki did in fact jerk his arm away from Delgado's grasp, the analysis from *Murad* suggests that the statute of limitations for Swiecicki's excessive-force claim began to run at the time of his arrest. The key question is one of timing. If Swiecicki resisted (*i.e.*, jerked his arm away), and if the resistance occurred *before* the use of force by Delgado, his conviction for resisting arrest would not be called into question even if he later recovered on a § 1983 excessive-force claim. Under these circumstances, the statute of limitations would have began to run at the moment of Swiecicki's arrest. *See Shamaeizadeh*, 182 F.3d at 396.

Our evaluation of the statute-of-limitations issue, however, requires us to consider the facts as Swiecicki has alleged them. *See id.*, 182 F.3d at 395-96 (noting that the Seventh, Eighth, and Eleventh Circuits have created a general exception to the *Heck* doctrine for Fourth Amendment unreasonable-search claims brought against state officials pursuant to § 1983, but that the Sixth Circuit employs a case-by-case approach). In order for Swiecicki to prevail on his § 1983 excessive-force claim *as he has alleged it*, he must prove that Delgado employed excessive force without provocation. Success on his § 1983 claim prior to the invalidation of his conviction by the Ohio Court of Appeals, therefore, would have necessarily implied the invalidity of his conviction for resisting arrest. *See White*, 1999 WL 775914, at *1; *Fraley*, 324 N.E.2d at 740. If Swiecicki had brought his excessive-force claim before such reversal, the district court would have had to dismiss it as *Heck*-barred. *See Heck*, 512 U.S. at 487 n.6 ("In order to prevail in this § 1983 action, he would have had to negate an element of the offense of which he has been convicted . . . . [T]he § 1983 action will not lie."). We therefore hold that the statute of limitations for Swiecicki's excessive-force claim did not begin to run until the Ohio Court of Appeals overturned his conviction.

We recognize, as Judge Sutton points out in his concurrence on this issue, that some excessive-force claims would not necessarily imply the invalidity of a conviction for resisting arrest. On these particular facts, however, that is not the case. The specific language of the Cleveland resisting-arrest ordinance (requiring that the arrest be lawful in order to convict) in combination with the applicable Ohio caselaw (where a finding of excessive force invalidates the lawfulness of an

arrest) dictates the result here. Swiecicki's success on his excessive-force claim would therefore necessarily imply the invalidity of his Ohio state-court conviction for resisting arrest. Thus, the statute of limitations did not begin to run until Swiecicki's state-court conviction was overturned.

**C.       Delgado's status as a state actor**

The district court also held that Delgado was not acting under color of state law until he actually placed Swiecicki under arrest. Swiecicki, on the other hand, argues that Delgado was acting under color of state law during the entire incident, and that the district court erroneously relied on disputed material facts in making its decision.

"To state a claim under § 1983, the plaintiff . . . must show that the alleged violation was committed by a person acting under color of state law." *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). Delgado, to be liable under § 1983, must have exercised power made possible "only because [he was] clothed with the authority of state law." *Id*. at 533 (citations and quotation marks omitted).

Whether a police officer like Delgado was acting under the color of state law poses a difficult question that depends on "the nature of the act performed, not the clothing of the actor or even the status of being on duty . . . ." *Id*. (citation and quotation marks omitted). Relevant considerations include whether the officer flashed a badge, identified himself as an officer, or arrested (or threatened to arrest) someone. *Parks v. City of Columbus*, 395 F.3d 643, 652 (6th Cir. 2005) (holding that an off-duty police officer acted under color of state law when he threatened a citizen with arrest at a local festival).

The parties agree that Delgado was off-duty at the time of the incident, even though he was wearing his police uniform and carrying his official weapons. As indicated by *Redding*, however, the nature of the act, rather than Delgado's clothing, informs the state-actor analysis. *Redding*, 241 F.3d at 533. We must therefore consider Delgado's behavior during the course of the incident, making sure to view the facts in the light most favorable to Swiecicki at this stage of the case. *See Matsushita*, 475 U.S. at 587.

Swiecicki alleges that Delgado used police procedures and was therefore a state actor during the entire incident. According to Swiecicki and several witnesses, Delgado grabbed Swiecicki by the shirt and arm to escort him, and Delgado himself admits that he put Swiecicki in the "escort position" before forcibly removing him from the bleachers. The district court failed to acknowledge Swiecicki's version of the facts, holding that "[a]lthough Officer Delgado may have been acting as a private actor when he began escorting Jeffrey Swiecicki out of the stadium pursuant to the rules and regulations of Jacobs Field, he asserted his official state power when he placed Jeffrey Swiecicki under arrest." Despite this broad pronouncement, the district court never articulated *why* it concluded that Delgado was not a state actor when he first escorted Swiecicki out of the stands.

Here, we believe the record establishes that Delgado was a state actor from the beginning of the incident in question because he "presented himself as a police officer." *Parks,* 395 F.3d at 652. Our conclusion is based not only on Delgado's attire, badge, and weapons, but also on the fact that Delgado told Swiecicki that "[w]e can either do this the easy way or the hard way." We recognize that these words, standing alone, would not necessarily rise to the level of a threatened arrest. After all, if a private citizen like Labrie, or a fellow Indians fan, had warned Swiecicki in a similar manner, no threat of arrest would have been present. And if Delgado had simply asked Swiecicki to calm down or risk being ejected from the game, we would be unable to conclude that Delgado acted under color of state law. *See Watkins v. Oaklawn Jockey Club*, 183 F.2d 440, 443 (8th Cir. 1950) (holding that an off-duty deputy sheriff who worked as a security guard at a race

track was not acting under color of state law when he ejected a patron because the deputy sheriff acted in the same manner that a civilian employee of the track would have acted).

But we are required to consider *all* of the relevant circumstances. *See Parks*, 395 F.3d at 652 ("[A]ll of these factors combined create the presumption of state action."). Rather than calmly asking Swiecicki to leave the stadium, Delgado, while wearing his uniform and carrying his official weapons, threatened Swiecicki and forcibly removed him from the bleachers. This evidence, combined with the fact that Delgado was hired by Jacobs Field to intervene "in cases requiring police action" suggests that his warning to Swiecicki amounted to a threat of arrest. Delgado apparently believed, moreover, that the incident was one requiring "police action" because he approached Swiecicki before Labrie had a chance to further investigate. In sum, this was more than a case in which a civilian employed by the Indians peaceably ejected an unruly fan from a baseball game—a procedure clearly contemplated by the rules and regulations of Jacobs Field. Delgado, in full police uniform, *forcibly* removed Swiecicki in the escort position.

All of this evidence, when considered together, indicates that Delgado was acting under color of state law at the time he removed Swiecicki from the bleachers. *See id.* at 652 (holding that the off-duty police officer was a state actor because he was in uniform, identified himself as an officer, and threatened arrest); *see also Villegas v. City of Gilroy*, 363 F. Supp.2d 1207, 1213 (N.D. Cal. 2005) (holding that an off-duty police officer who ejected citizens from a festival held at a public park acted under color of state law because her presence was intended to give "some air of authority as a police officer" and because she had "an active hand assisting in enforcing [the] dress code policy by intimidating Plaintiffs into leaving the festival.") (quotation marks omitted). *But see Herrera v. Chisox Corp.*, No. 93 C 4279, 1995 WL 599065, at *5-6 (N.D. Ill. Oct. 6, 1995) (unpublished) (holding that off-duty deputy sheriffs did not act under color of state law when they allegedly arrested Herrera at a Chicago Whitesox game because the deputy sheriffs were not wearing their uniforms, did not carry official weapons, filed a Whitesox incident report rather than an arrest report, and did not accompany officers of the Chicago Police Department who took Herrera to the police station).

Delgado's status as a state actor continued as he escorted Swiecicki through the tunnel. After removing Swiecicki from the bleachers, Delgado formally placed Swiecicki under arrest, wrestled him to the ground using the arm-bar technique, and attempted to handcuff him. Such actions were clearly carried out "with the authority of state law." *Redding*, 241 F.3d at 533. We therefore hold that Delgado was a state actor for the duration of the incident. *See Layne v. Sampley*, 627 F.2d 12, 13 (6th Cir. 1980) (holding that the question of whether someone acted under the color of state law may be determined as a matter of law unless there remain unanswered questions of fact for the jury to decide).

## D.          The law of qualified immunity

We will "review the denial of summary judgment on grounds of qualified immunity *de novo* because application of this doctrine is a question of law." *McCloud v. Testa*, 97 F.3d 1536, 1541 (6th Cir. 1996). But "to the extent that there is disagreement about the facts, . . . we must review the evidence in the light most favorable to the Plaintiff[], taking all inferences in [his]favor." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004).

In determining whether a law enforcement officer is shielded from civil liability due to qualified immunity, this court typically employs a two-step analysis: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). In addition to the two steps listed above, this court occasionally performs a third step in the qualified immunity analysis.

*See Estate of Carter*, 408 F.3d at 311 n.2 ("Panels of this court occasionally employ a three-step qualified immunity analysis, as opposed to the two-step analysis set forth here. . . . [B]oth the two-step approach and the three-step approach can be said to capture the holding of [*Saucier*].") (citations omitted). When utilized, this third step requires inquiry into "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Champion*, 380 F.3d at 905 (citation and quotation marks omitted).

The Supreme Court since *Saucier* has continued to use the two-step approach to qualified immunity, but this court has noted that "the three-step approach may in some cases increase the clarity of the proper analysis." *See Estate of Carter*, 408 F.3d at 311 n.2. If, on the other hand, the case at issue "is one of the many cases where, if the right is clearly established, the conduct at issue would also be objectively unreasonable," then this court has "collapse[d] the second and third prongs" in an effort to "avoid duplicative analysis." *Caudill v. Hollan*, 431 F.3d 900, 911 n.10 (6th Cir. 2005).

Throughout the analysis, the burden is on Swiecicki to show that Delgado is not entitled to qualified immunity. *See Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) ("Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity."). The district court in the present case utilized the typical two-step analysis and assumed that Swiecicki's constitutional rights were violated, but concluded that Delgado was nevertheless entitled to qualified immunity. On appeal, Swiecicki claims that Delgado (1) did not have probable cause to make the arrest, and (2) violated his clearly established First Amendment rights by arresting Swiecicki based on the content of his speech.

### 1.        *Swiecicki's probable-cause claim*

In order for the arrest to survive constitutional scrutiny, Delgado must have had probable cause to believe that Swiecicki committed the offenses charged. *See Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (holding that the defendant officers were entitled to qualified immunity "if a reasonable officer could have believed that probable cause existed" to make the arrest). In determining whether Delgado had probable cause to arrest Swiecicki for disorderly conduct, we must decide whether, "at that moment [of the arrest], the facts and circumstances within [his] knowledge and of which [he] had reasonably trusty information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

Probable cause is an issue of fact for the jury to resolve if there are any genuine issues of material fact that are relevant to the inquiry. *See St. John v. Hickey*, 411 F.3d 762, 770 (6th Cir. 2005) (holding that genuine issues of material fact precluded summary judgment on qualified immunity grounds). An officer may not base his probable-cause determination on speech protected by the First Amendment. *See Sandul v. Larion*, 119 F.3d 1250, 1256 (6th Cir. 1997). But to the extent that probable cause existed for *either* of Swiecicki's charges (disorderly conduct or resisting arrest), the arrest was lawful with respect to the probable-cause requirement. *See Lyons v. City of Xenia*, 417 F.3d 565, 573-75 (6th Cir. 2005) (granting qualified immunity to the defendant officers on the plaintiff's probable-cause claim).

The offense of disorderly conduct is defined in the City of Cleveland Code, with the relevant portions set forth below:

*605.03 Disorderly Conduct; Intoxication*

. . .

(b) No person, while voluntarily intoxicated shall do either of the following:

> (1) In a public place or in the presence of two or more persons, engage in conduct likely to be offensive or to cause inconvenience, annoyance, or alarm to persons of ordinary sensibilities, which conduct the offender, if he were not intoxicated, should know is likely to have such effect on others. . . .

Cleveland Cod. Ord. § 605.03. Section 605.03 therefore requires that Delgado not only had probable cause to believe that Swiecicki was engaging in offensive or alarming behavior, but also that he was intoxicated. *See id.*

As discussed above, the first step in the qualified immunity analysis is to determine whether Swiecicki has sufficiently alleged a constitutional violation. In determining whether Delgado had probable cause to arrest Swiecicki, we must focus only on those facts within Delgado's knowledge at the moment Swiecicki was arrested. *See Hunter*, 502 U.S. at 228 (holding that the probable-cause inquiry focuses on facts within the arresting officer's knowledge at the time of the arrest). We are still required, however, to consider the facts in the light most favorable to Swiecicki. *See Champion*, 380 F.3d at 900.

Swiecicki argues that his heckling was not so offensive as to give Delgado probable cause to believe that Swiecicki was violating the disorderly conduct ordinance. He denies that he used profane language, and he further argues that the *content* (i.e., the underlying message) of his speech would have been protected by the First Amendment even if profane. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (holding that the only type of language denied First Amendment protection is fighting words); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992) (clarifying *Chaplinsky* and holding that even though a particular "mode of speech" (such as fighting words) may not be protected by the First Amendment, "the underlying message" still receives First Amendment protection). Delgado therefore lacked probable cause to arrest Swiecicki if Delgado based his decision on protected speech. *See Sandul,* 119 F.3d at 1256 (holding that an officer could not rely solely on protected speech to establish probable cause). The record suggests such a motivation because Delgado himself indicated that he responded to Swiecicki's "foul" language.

Even though Delgado did not have probable cause to arrest Swiecicki based on the *content* of his speech, we next consider whether the *manner* of Swiecicki's speech was sufficient to lead Delgado to believe that probable cause existed. The district court held that "a reasonable police officer could have . . . believed that there was probable cause based on Jeffrey Swiecicki's loud and rowdy manner to support an arrest for aggravated disorderly conduct." Because a genuine issue of material fact exists as to Swiecicki's manner of speech, this legal conclusion by the district court is not supported by the record. Swiecicki denies that his behavior was inappropriately loud or offensive, and the parties agree that no one actually complained about his behavior. Although Swiecicki admits that he was leading the crowd of hecklers, the record establishes that the fans were "really excited" at that particular game and that almost everyone in the stands was shouting. Jacobs Field, moreover, encourages fans to cheer and make noise, meaning that loud or even rowdy behavior was commonplace at games. *See Swiecicki*, 149 Ohio App.3d at 81.

Taking the facts and circumstances in the light most favorable to Swiecicki, Delgado did not have probable cause to believe that the manner of Swiecicki's speech rose to a level prohibited by the disorderly conduct ordinance. *See Spokane v. McDonough*, 79 Wash.2d 351 (Wash. 1971) (interpreting a similar statute and holding that conduct that is offensive to a person of ordinary

sensibilities in one setting might be perfectly acceptable in other settings).   We therefore have no need to consider whether Delgado had probable cause to believe that Swiecicki was intoxicated.

Turning to Swiecicki's other offense, Cleveland's resisting-arrest ordinance provides: "No person, recklessly or by force, shall resist or interfere with a lawful arrest of himself or another." Cleveland Cod. Ord. § 615.08(a).   Delgado alleges that Swiecicki jerked his arm away while Delgado was escorting him out of the stadium, but Swiecicki claims that his protests were verbal only.  Rather than taking the facts in the light most favorable to Swiecicki, the district court held that Swiecicki's arm movement could have been interpreted by a reasonable officer as an attempt to resist arrest.  The district court thus improperly concluded that Delgado was entitled to qualified immunity.

Cleveland's resisting-arrest ordinance requires a lawful arrest on the underlying charge in order to sustain a conviction for resisting arrest.  Cleveland Cod. Ord. § 615.08.  The above analysis indicates that a genuine issue of material fact exists as to whether Delgado had probable cause to arrest Swiecicki for the underlying offense of disorderly conduct.  Swiecicki's Fourth Amendment right to be free from an arrest without probable cause was clearly established at the time of his arrest in 2001.  We therefore reverse the district court's grant of qualified immunity to Delgado on this Fourth Amendment claim.

### 2.        *Swiecicki's First Amendment claim*

Swiecicki also alleges that Delgado impermissibly arrested him for saying "Branyon, you suck" and "Branyon, you have a fat ass," and for verbally protesting his arrest.  The district court acknowledged that "[i]f Officer Delgado arrested Jeffrey Swiecicki even partially because of the content of his speech, then Officer Delgado would have violated Jeffrey Swiecicki's constitutional right to freedom of speech."  After assuming without discussion that Swiecicki had alleged sufficient facts to demonstrate a constitutional violation, the court went on to hold that the right was not clearly established.

In so doing, the district court failed in its duty to resolve the preliminary issue of the constitutional violation before proceeding to the second step of the qualified immunity analysis.  *See Saucier*, 533 U.S. at 201 ("[I]f a [constitutional] violation could be made out on a favorable view of the parties' submissions, the *next*, *sequential step* is to ask whether the right was clearly established.") (emphasis added).  Although we could remand the case in order for the district court to properly determine this issue, we instead will make the determination ourselves in light of the completeness of the record and in the interests of judicial economy.  *See Beaty v. United States*, 937 F.2d 288, 291 (6th Cir. 1991) (opting to resolve an issue not decided below because "the record is complete, and it would be a waste of everyone's time to remand to the district court what can be decided now as a matter of law").

Delgado first argues that Swiecicki's First Amendment protections did not apply in Jacobs Field, which he alleges is a private park.  In support of this proposition, Delgado contends that the game ticket was a license that Jacobs Field could revoke at will, and that a private entity acting on its own cannot deprive a citizen of First Amendment rights. We are not persuaded.  Swiecicki does not challenge either the fan-behavior rule or the authority of Jacobs Field officials to eject him from the game.   Instead, he challenges Delgado's decision as a state actor to threaten and later actually arrest him for an alleged violation of city ordinances.  We therefore hold that Swiecicki's First Amendment protections apply.

a.      *Swiecicki's heckling*

The Supreme Court in *Chaplinsky* held that "fighting words" receive very limited First Amendment protection because they "are of such slight social value as a step to the truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." 315 U.S. at 572. Fighting words were defined in *Chaplinsky* as "those by which their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.* In *R.A.V.*, the Supreme Court clarified the scope of First Amendment protection afforded fighting words when it held that because the underlying message expressed by the fighting words is protected by the First Amendment even though the "nonspeech" element is not, any government regulation must be content-neutral. 505 U.S. at 386. With regard to government regulation, this court has previously held that unless the speech in question constitutes fighting words, it cannot serve as the basis for a violation of municipal ordinances. *See Sandul*, 119 F.3d at 1256. The First Amendment therefore provides expansive protection of Swiecicki's speech unless he uttered fighting words.

Contrary to the law of this circuit, the district court improperly considered the facts in the light most favorable to Delgado rather than to Swiecicki in determining that Delgado was entitled to qualified immunity. *See Champion*, 380 F.3d at 900. The district court, for example, relied on Delgado's testimony that there was a man with a young girl who appeared to be disturbed by Swiecicki's comments, and that the man thanked the officer for requesting that Swiecicki stop heckling the players. Based on this testimony, the district court held that Delgado's actions were reasonable given the "loudness and disruptiveness of [Swiecicki's] heckling and the apparent discomfort of other patrons."

Swiecicki contends, however, that he was heckling in a manner similar to other fans at the game, and he maintains that he did not use profane language. Delgado's interaction with the man and his young daughter is similarly disputed, with Swiecicki claiming that there were no children seated near him in the bleachers. The district court clearly erred in basing its holding on facts disputed by Swiecicki.

If, as Swiecicki alleges, Delgado arrested him based on the content of his heckling, then the arrest constituted a violation of Swiecicki's First Amendment rights. *See Sandul*, 119 F.3d at 1256. There is also no evidence in the record that Swiecicki's heckling rose to the level of fighting words. Branyon, the player who was the subject of Swiecicki's comments, apparently did not hear Swiecicki's jeers. Nor is there any evidence that other fans, even if they were offended by the jeers, were incited to become violent. *See Chaplinsky*, 315 U.S. at 572. Because his heckling did not provoke the type of lawless action referred to in *Chaplinsky*, the First Amendment provided protection for Swiecicki's words.

Based on our conclusion that a genuine issue of material fact exists as to whether Delgado committed a constitutional violation in arresting Swiecicki, we now consider whether Swiecicki's First Amendment protection was clearly established at the time of the arrest. *Chaplinsky*, 315 U.S. at 572, plainly held that speech does not lose its First Amendment protection unless it constitutes fighting words. This court's decision in *Sandul*, 119 F.3d at 1256, similarly makes clear that the content of Swiecicki's speech could not serve as the basis for a violation of Cleveland's disorderly conduct ordinance. Swiecicki's First Amendment right to free speech was thus clearly established at the time of Delgado's actions in question. We therefore reverse the grant of qualified immunity awarded to Delgado on this issue.

b.      *Swiecicki's verbal protests*

With regard to Swiecicki's verbal protests during his forcible removal from the game and subsequent arrest, this court held in *McCurdy v. Montgomery County*, 240 F.3d 512, 520 (6th Cir. 2001), that "[t]here can be no doubt that the freedom to express disagreement with state action,

without fear of reprisal based on the expression, is unequivocally among the protections provided by the First Amendment." "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.*" City of Houston v. Hill*, 482 U.S. 451, 462-63 (1987).

On the basis of *McCurdy*, *Hill*, and the discussion above regarding *Chaplinsky*, Swiecicki's verbal protests during his arrest are protected by the First Amendment unless they rose to the level of fighting words. *See also Barnes v. Wright*, ___ F.3d ___, 2006 U.S. App. LEXIS 13610, at *19 (6th Cir. June 2, 2006) (holding that in order to state a successful First Amendment retaliation claim under § 1983, the plaintiff must prove a lack of probable cause for his arrest). Police officers like Delgado, moreover, "are expected to exercise greater restraint in their response than the average citizen." *Id.* (citation and quotation marks omitted). Delgado does not challenge these general tenets. Instead, he claims that his decision to arrest Swiecicki was not based on Swiecicki's verbal protests.

In holding that "there were grounds for the resisting arrest charge that involved physical action and had nothing to do with the content of Jeffrey Swiecicki's speech," the district court took as true Delgado's testimony that Swiecicki physically jerked his arm away from Delgado. The district court in doing so failed to consider Swiecicki's contention that he did not pull his arm away during the arrest and that Delgado instead acted in response to Swiecicki's verbal protests. If based on Swiecicki's version of the facts, in which no physical resistance occurred, the arrest could only have been the result of Swiecicki's speech—thus constituting a constitutional violation. *See McCurdy*, 240 F.3d at 512, 515 (holding that an officer violated the plaintiff's First Amendment rights where the arrest was based on the plaintiff's verbal challenge of "what the f**k do you want?"); *see also Greene v. Barber*, 310 F.3d 889 (6th Cir. 2002) (holding that the First Amendment prohibited a police officer from retaliating against a plaintiff who called him an a**hole).

Given the relatively tame nature of Swiecicki's verbal protests in comparison to those in *McCurdy* and *Greene*, one might reasonably question whether Delgado's decision to arrest Swiecicki was based on Swiecicki's protests alone. We are nevertheless required to accept Swiecicki's version of the facts at the summary judgment stage of this case, which leaves his verbal protests as the only basis for Delgado's actions. Because Delgado would have lacked probable cause to arrest Swiecicki under these circumstances, and because Swiecicki's right to verbally protest his arrest was clearly established at the time of the arrest in question, we reverse the district court's grant of qualified immunity regarding Swiecicki's First Amendment claim.

## E.     The dismissal of Swiecicki's state-law claims

In addition to his claims for the alleged constitutional violations brought pursuant to § 1983, Swiecicki brought several state-law claims. The district court granted summary judgment to Delgado on the malicious prosecution claim and declined to maintain supplemental jurisdiction over the remaining state-law claims, dismissing the latter without prejudice.

Ohio has set forth the elements of a malicious prosecution claim as follows: (1) malice in instituting (or continuing) the prosecution, (2) lack of probable cause, and (3) termination of the action in favor of the defendant. *Trussell v. General Motors Corp.*, 559 N.E.2d 732, 735 (Ohio 1990) (clarifying the law on malicious prosecutions). The district court, relying on the second element, granted summary judgment in Delgado's favor because it had earlier held that Delgado had probable cause for Swiecicki's arrest.

Because we hold today that Swiecicki has raised a genuine issue of material fact as to whether Delgado had probable cause to arrest him, only the first and third elements remain:

(1) malice in instituting or continuing the prosecution, and (3) termination of the action in favor of the defendant. *Id.* at 735. Swiecicki's convictions were reversed on appeal, which leaves only the malice element. As to this last element, Ohio law permits a jury to infer malice if it finds that Delgado acted for any improper purpose. *See Criss v. Springfield Twp.*, 564 N.E.2d 440, 443 (Ohio 1990) ("If the basis for prosecution cannot be shown, those who made the decision will appear to have acted with no basis—that is, maliciously."). We therefore reverse the dismissal of Swiecicki's malicious prosecution claim.

Concerning the dismissal of the remaining state-law claims, such a dismissal was in accordance with the usual course of proceedings in this circuit. *See Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001) ("[T]he usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment."). But because we are reversing the grant of summary judgment on Swiecicki's federal claims, we also reverse the dismissal of Swiecicki's other state-law claims. The district court will now need to reconsider whether it should exercise jurisdiction over the various state-law claims in light of our holding. *See* 28 U.S.C. § 1367(c)(3) (outlining the circumstances in which a district court can decline to exercise supplemental jurisdiction).

## III.  CONCLUSION

For a baseball fan to make a "federal case" out of being ejected from a game may well strike many as a colossal waste of judicial resources. A jury might well agree. But this is the type of case where the ultimate result is totally dependent on whose version of the facts one believes. Under these circumstances, the grant of summary judgment to the police officer on the basis of qualified immunity is inappropriate. We therefore **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

---

## CONCURRING IN PART, CONCURRING IN THE
## JUDGMENT IN PART AND DISSENTING IN PART

---

SUTTON, Circuit Judge, concurring in part, concurring in the judgment in part and dissenting in part. I agree with the court's disposition of Swiecicki's false-arrest claim and write separately to express some reservations about the disposition of the other two counts—the excessive-force and free-speech claims.

At first blush, it would seem to me, the district court correctly rejected Swiecicki's excessive-force claim as a matter of law because it was time barred. The statute of limitations for an excessive-force claim generally runs from the date of the abusive police conduct. That is not the case, however, if success on the § 1983 claim would "necessarily imply the invalidity of his conviction" for resisting arrest. *Heck v. Humphrey*, 512 U.S. 477, 487 (1994). The question, then, is whether *Heck* applies: If it does, then the § 1983 action is not time barred (because Swiecicki would have no obligation to file a suit that *Heck* prohibits him from filing); if it does not, then the § 1983 action is time barred (because Swiecicki would have no excuse for delaying the filing of his lawsuit).

Under *Heck*, the salient question is whether the § 1983 claim "necessarily" implies the invalidity of the state-court conviction. *See Hill v. McDonough*, 126 S. Ct. 2096, 2103–04 (2006) ("[T]he injunction Hill seeks would not necessarily foreclose the State from implementing the lethal injection sentence under present law, and thus it could not be said that the suit seeks to establish 'unlawfulness [that] would render a conviction or sentence invalid.'") (quoting *Heck*, 512 U.S. at 486). As a matter of sheer logic, one may bring a successful excessive-force claim without having to establish that the resisting-arrest charge was unlawful: An officer could legitimately arrest a suspect but use excessive force in bringing the suspect to the station. And as a matter of state-court precedent, Ohio law permits exactly that type of excessive-force claim, namely one that follows a lawful arrest. *See City of Cleveland v. Murad*, 616 N.E.2d 1116, 1120 (Ohio Ct. App. 1992) (recognizing that an excessive-force claim and a resisting-arrest conviction may co-exist in some settings); *City of Columbus v. Purdie*, Nos. 84AP-127 & 84AP-128, 1984 WL 6005, at *3 (Ohio Ct. App. Nov. 29, 1984) (same).

Under these circumstances, the question is not whether Swiecicki's claim, "as he has alleged it" as a matter of fact, Maj. Op. at 5, would imply the invalidity of his state-court conviction. One could always write a complaint so that success on its "allegations" would negate a state-court conviction. In this case Swiecicki could have brought an utterly unrelated § 1983 action concerning the lack of medical care he received in prison and yet still could have "alleged" that his claim arose from a false arrest. The question rather is the relationship between the *elements* of the state conviction and the *elements* of the § 1983 claim. *Heck*, 512 U.S. at 487 n.6 (explaining that a Fourth Amendment claim of a defendant convicted in state court for resisting arrest would necessarily imply the invalidity of that conviction because "to prevail in this § 1983 action, he would have to *negate an element of the offense* of which he has been convicted") (emphasis added). In this instance, because some excessive-force claims would not imply the invalidity of an Ohio conviction for resisting arrest, it follows that Swiecicki's excessive-force claim did not "necessarily imply the invalidity of his conviction" for resisting arrest. *Id.* at 487.

But even if the focus were on Swiecicki's claim "as he has alleged it," Maj. Op. at 5, that would not help Swiecicki here. He did not condition his excessive-force claim on any one period of time during his encounter with Delgado or on the assumption that he had not resisted arrest. In full, his complaint said, "On or about the evening of September 25, 2001 Defendant JOSE

DELGADO deliberately and intentionally used excessive and unreasonable force and violence upon the person of Plaintiff JEFFREY SWIECICKI." JA 11. And he could prevail on this claim whether he resisted arrest or not. *See Murad*, 616 N.E.2d at 1120; *Purdie*, 1984 WL 6005, at *3.

This circuit (in an unpublished decision) and several other circuits (in published decisions) have held that excessive-force claims may proceed in the face of a *Heck* challenge despite the existence of an outstanding conviction for resisting arrest. *See Sigley v. Kuhn*, Nos. 98-3977, 99-3531, 2000 WL 145187, at *4 (6th Cir. Jan. 31, 2000) ("Sigley's section 1983 action attempts to prove that Kuhn used unreasonable and excessive force subsequent to Sigley's arrest and resistance. Nothing in that determination invalidates the underlying criminal conviction for resisting arrest."); *Martinez v. City of Albuquerque*, 184 F.3d 1123, 1127 (10th Cir. 1999) ("[W]hether [plaintiff] resisted arrest . . . is a question separate and distinct from whether the police officers exercised excessive or unreasonable force in effectuating his arrest."); *Nelson v. Jashurek*, 109 F.3d 142, 146 (3d Cir. 1997) (holding that excessive-force claim was not *Heck* barred because "it is possible for a finding that the defendant was resisting arrest to coexist with a finding that the police used excessive force to subdue him") (internal quotation marks and brackets omitted).

*Shamaeizadeh v. Cunigan*, 182 F.3d 391 (6th Cir. 1999), which involved a § 1983 Fourth Amendment claim arising from an illegal search, does not point to a contrary conclusion. Consistent with *Heck*, *Shamaeizadeh* recognizes that "a prisoner seeking to challenge an allegedly unconstitutional [act] in a § 1983 claim must show that a decision in his favor would not imply the invalidity of his outstanding conviction." 182 F.3d at 398. Shamaeizadeh could not satisfy this burden because "the only evidence [against him in his criminal trial] . . . was evidence discovered . . . during the allegedly illegal search." *Id.* Because success in his § 1983 claim would undermine the only evidence that could potentially prove the central elements of the criminal charge against him, "it would not have been possible, while criminal proceedings . . . were pending, to determine whether a decision on Shamaeizadeh's claim would imply the invalidity of his potential conviction." *Id.*

Swiecicki does not face the same problem. While he has alleged that Delgado's force was unprovoked (because he did not resist the arrest), the fact remains that he need not prove that allegation to prevail on his § 1983 claim. A jury would not need to believe all of Swiecicki's factual allegations to find in his favor on the excessive-force claim: It could find that even if Swiecicki had resisted arrest, Delgado still used excessive force in response.

While the court's approach does not seem consistent with *Heck*, I must acknowledge that there is something awkward about saying the *Heck* bar should not apply here. Had Swiecicki been forced to file his § 1983 action before the completion of his successful direct criminal appeal regarding the resisting-arrest charge, he plainly would have been forced to file a diminished version of his claim. True enough, he could still prevail on that claim. But he would have been required to show that the officer's use of force exceeded what a reasonable officer would do in quieting an individual resisting arrest, as opposed to showing only that the force exceeded what a reasonable officer would do in arresting someone who did not resist arrest. It is difficult to imagine any litigant preferring to file the one claim over the other. In this setting, *Heck* also seems to force litigants to split their claims—bringing the excessive-force claim immediately while awaiting success on challenging the resisting-arrest conviction before bringing a false-arrest claim. Perhaps the answer is that equitable tolling should govern situations like this one. Either way, these considerations prompt me to concur in, rather than dissent from, the court's judgment on this claim.

As for Swiecicki's First Amendment claim, I strain to see how Swiecicki has raised a cognizable claim of First Amendment retaliation, as opposed to false arrest or excessive force. Swiecicki made two relevant statements: he criticized Cleveland Indians' outfielder Russell Branyon, and he questioned Delgado why he was being removed from his seat in the stadium. It

strains credulity to believe that Delgado was retaliating against Swieciciki for criticizing one of the Indians. Rarely does an inning in a baseball game go by (particularly during a losing season) without some fan expressing frustration with his team. And nothing in the record suggests that Delgado saw himself as Branyon's knight errant. As in virtually any debate about whether one fan's exuberance is at the expense of another's enjoyment, words will be involved and so will their volume. But when, as here, the ticket to the ball game explained that any fan could be removed if he "use[d] obscene or abusive language, or engag[ed] in any other antisocial conduct offensive to those around [him]," JA 46, and when it is difficult to understand how a jury legitimately could infer that Delgado removed Swiecicki in retaliation for the content of his speech, it seems to diminish rather than uplift the First Amendment to apply it in this setting. *See* JA 70 (Delgado "saw [Swiecicki] being disorderly and loud"); JA 86–87 (another employee said Swiecicki's language "sounded foul and abusive" to him and testified that he intended "[t]o see who" had made the remarks "and to tell him to quit" "[b]ecause we don't allow foul and abusive language in the Jacobs Field, because it's a family oriented venue").

Independent of the question whether Delgado had probable cause to arrest Swiecicki (which clearly presents a jury question), I also am hard pressed to understand how Swiecicki's repeated question—"What did I do wrong?" JA 122—shows that the decision to arrest him established a cognizable free-speech retaliation claim. During most encounters with the police, individuals exchange words with an officer, and the phrase "What did I do wrong?" is perhaps one of the most frequent. Consider an everyday traffic stop. Of course, Swiecicki had a right to ask the question. But no less importantly, the officer still had a right to arrest him without incurring the risk of a § 1983 free-speech claim or, worse, undertaking the precaution of inserting ear plugs in escorting every unruly fan out of a stadium.

Our circuit's cases also seem to be one step removed from the innocuous setting of this case. In *Greene v. Barber*, 310 F.3d 889 (6th Cir. 2002), in contrast to this dispute, the plaintiff presented evidence that his speech had motivated the officer's actions. *See id.* at 892 ("Well, Lt. Barber became very arrogant, you know, very very arrogant with me, like, look I don't have to answer your questions, this is the way we do it. You don't like it, you know, that's just like too bad. So I responded to him, you know, you're really being [an] asshole. And he took great exception to that. . . . He said to me, 'You can't talk to me like that in my building.' . . . I said to him—I responded, I said, 'What do you mean I can't talk to you like this in your building.' I said, 'This is . . .'—this is—'I'm exercising my freedom of speech.' I said, 'This is the United States of America and we have freedom of speech here and if you don't like it you should move to another country.' . . . [He answered], 'Well, not in my building,' again, very adamantly. 'Not in my building,' just like that. And that's when I told him, I said, 'Well, if that's how you feel you're really stupid.' And that's when he turned to me and said, 'You're under arrest.'").

*McCurdy v. Montgomery County*, 240 F.3d 512 (6th Cir. 2001), offers still less support for Swiecicki's claim. It holds only that it is clearly established that individuals may verbally challenge an officer's authority. *Id.* at 520. *McCurdy* did not have before it, and thus did address, the question whether the suspect's words motivated the officer's actions—because the district court had not addressed that question. *See id.* ("Because the district court did not address whether McCurdy's arrest was at least partially motivated by protected conduct, we remand for further proceedings."); *see also Doyle v. McFadden*, Nos. 04-4253, 04-4367, 2006 WL 1479047, at *2 (6th Cir. May 26, 2006) ("The *McCurdy* court remanded the case, as the district court had failed to inquire about whether speech was a motivating factor in the arrest.").

At any rate, "What did I do wrong?" offers a poor analogy to the provocative speech at issue in that case. *See id.* at 515–16 ("McCurdy . . . demanded [of Officer Cole], 'what the fu*k do you want?'" and "exclaimed 'what the fu*k is your job?'" and stated that "he did not have to do 'sh*t' that Officer Cole ordered."). It is one thing to say that the plaintiff's protestations in *McCurdy* might

have established a triable issue of fact about free-speech retaliation on remand (the case settled before the trial court could decide the issue); it is quite another to say that "What did I do wrong?" definitively does so.