*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0022p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ANTHONY HARRIS,

       *Plaintiff-Appellant,*

    *v.*

AMANDA SPIES BORNHORST et al.,

       *Defendants-Appellees.*

No. 06-3729

>

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 03-01827—John R. Adams, District Judge.

Argued: May 31, 2007

Decided and Filed: January 14, 2008

Before: MOORE and GRIFFIN, Circuit Judges; McKINLEY, District Judge.[*]

---

## COUNSEL

**ARGUED:** Daniel R. Warren, BAKER & HOSTETLER, Cleveland, Ohio, for Appellant. Kenneth C. Apicella, ELLISON, NIELSEN, ZEHE & ANTAS, Chicago, Illinois, for Appellees. **ON BRIEF:** Daniel R. Warren, Stephan J. Schlegelmilch, Thomas D. Warren, BAKER & HOSTETLER, Cleveland, Ohio, for Appellant. Timothy R. Cleary, Robert G. Stiefvater III, CLEARY & ASSOCIATES, Cleveland, Ohio, for Appellee.

    MOORE, J., delivered the opinion of the court, in which McKINLEY, D. J., joined. GRIFFIN, J. (pp. 18-21), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

    KAREN NELSON MOORE, Circuit Judge. Plaintiff-Appellant Anthony Harris ("Harris") filed suit against Defendants-Appellees Amanda Spies Bornhorst ("Spies")[1] and Tuscarawas

---

[*] The Honorable Joseph H. McKinley, Jr., United States District Judge for the Western District of Kentucky, sitting by designation.

[1] It appears that Spies no longer uses the surname "Bornhorst"; both parties' briefs refer to her as "Spies," as do we.

County, Ohio ("Tuscarawas") (collectively, the "defendants"),[2] asserting claims under the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983, and for malicious prosecution, defamation, and tortious interference with a prospective contract, pursuant to Ohio state law. The district court granted summary judgment in favor of the defendants on all of Harris's claims, and Harris now appeals. For the reasons set forth below, we **VACATE** the district court's grant of summary judgment in favor of the defendants on Harris's § 1983 and *Brady* claims, **REVERSE** the grant of summary judgment as to Harris's First Amendment retaliation, defamation, and tortious-interference claims, **AFFIRM** the grant of summary judgment as to all of Harris's other claims, and **REMAND** this case to the district court for further proceedings.

## I. BACKGROUND

On the afternoon of June 27, 1998, Lori Duniver discovered that her five-year-old daughter, Devan, was missing from her home in New Philadelphia, Ohio. The following day, Devan's body was found in a wooded area near her home. She had been stabbed seven times in the neck.

Captain Jeffrey Urban ("Urban") of the New Philadelphia Police Department led the investigation into Devan's murder. Urban identified several "persons of interest" who might have killed Devan, including Devan's mother, Lori, who had recently called a suicide hotline to report that she was depressed and considering harming herself and her children; Lori's boyfriend, Jaimie Redmond, a drug addict and felon of whom Devan was afraid, who had previously kidnapped Devan for three days and beaten her with a belt, who may have been in the neighborhood of Devan's house at the time of her disappearance, who was later found in possession of an unexplained pack of children's playing cards, and whose alibi witness was later discovered to have given a false name and Social Security number to the police; Devan's father, Richard, a violent alcoholic who had recently complained about having to pay child support for Devan and who refused to help Lori search for Devan after Devan's disappearance, claiming to be too drunk to drive; Devan's brother, Dylan, who was described by several individuals as violent and who had recently stabbed a cat; and Harris, a twelve-year-old, African-American neighbor of the (Caucasian) Dunivan family.

Harris had no criminal record, but he had once pushed or struck[3] Devan in the arm and threatened to kill her, and he was seen, soon after Devan's disappearance, near the wooded area where her body would later be found. On the day after Devan's disappearance, before her body was found, Harris approached Urban and another officer and volunteered the statement that Devan was a "rude, nasty little girl who would eat in front of him." Joint Appendix ("J.A.") at 487 (Urban Dep. at 253). Several days later, when questioned by Urban about his whereabouts at the time of Devan's disappearance, Harris gave conflicting answers.

On July 15, 1998, at Urban's request, Harris's mother, Cyndi Harris ("Cyndi") brought Harris to the police station for a voice-stress analysis ("VSA"), which Urban described as being similar to a polygraph, or lie-detector, test. The VSA was to be conducted by Millersburg, Ohio police chief Tom Vaughn ("Vaughn"). Upon Harris's arrival at the station, Vaughn took him into a room with a one-way mirror, while Urban and Cyndi sat in an adjacent room from which they could, through the mirror, see (but not hear) the conversation between Vaughn and Harris. Cyndi was told that Vaughn would conduct a pre-test interview to relax Harris and then perform the VSA.

---

[2] Harris's complaint asserts causes of action against additional defendants, but those claims are not at issue in this appeal.

[3] Spies testified during her deposition that Harris had struck Devan. J.A. at 783 (Spies Dep. at 282-83). Harris has variously characterized his action as hitting or tapping Devan, J.A. at 703 (Urban-Harris Conversation Tr. at 264), and as pushing her, J.A. at 90 (Suppression Hr'g Tr. at 2 (Vaughn Interrogation Recording)).

Once inside the interview room, however, Vaughn informed Harris of his *Miranda*[4] rights and then proceeded to interrogate him about the murder. Under Vaughn's persistent questioning, Harris confessed to having killed Devan, but many aspects of Harris's confession conflicted with the known facts of the murder. When asked to provide a written statement, Harris asked to speak with his mother and then immediately recanted his confession.

Upon learning that Harris had confessed, Urban telephoned Spies, the Tuscarawas County Chief Prosecutor, who came to the station and listened to the tape of Vaughn's interrogation and Harris's confession. At Spies's direction, Urban then arrested Harris and transported him to a detention facility.

Harris was subsequently tried in a juvenile court and convicted of the murder of Devan Duniver. On March 17, 1999, he was sentenced to a term of incarceration to last until his twenty-first birthday. On June 7, 2000, however, the Ohio Court of Appeals reversed his conviction, on the ground that the juvenile court had improperly denied a motion to suppress his confession, which was coerced in violation of his Fifth Amendment privilege against self-incrimination. *In re Harris*, No. 1999AP030013, 2000 WL 748087 (Oh. Ct. App. June 7, 2000).

On June 8, 2000, Harris was released from prison. Spies held a press conference that day, at which she stated, "[F]rankly, in my heart and in my gut, I feel that Anthony Harris is responsible for the murder of Devan Duniver." J.A. at 725 (Spies Dep. at 42-45). No further charges were ever filed against Harris, and no one has since been arrested for or convicted of Devan's murder.

Harris filed the instant suit in the United States District Court for the Northern District of Ohio in August 2003. The following year, he applied to enlist in the Marine Corps. During the application process, he disclosed to Marine Corps Master Sergeant Mark Baker ("Baker") that he had been convicted of and incarcerated for murder and that the conviction had later been reversed. Harris signed a release permitting the Marine Corps to access the police and court records pertaining to his criminal case. Baker then instructed Marine Corps Staff Sergeant William Brahen ("Brahen") to go to the New Philadelphia courthouse and retrieve those records.

When Brahen arrived in Spies's office and requested the documents, Spies reacted by saying, in a hostile tone of voice, "[A]re you fucking kidding me?" J.A. at 1372-73 (Brahen Dep. at 25-26). She asked Brahen to accompany her to a conference room, where she "proceeded to tell [him] a little bit about the case and what happened." J.A. at 1373 (Brahen Dep. at 26). She asked Brahen whether "the Marine Corps would actually take Anthony Harris into the Marines." *Id.* (Brahen Dep. at 28). Brahen became uncomfortable and asked Spies to speak with Baker on the telephone. Spies agreed and proceeded to inform Baker that Harris would always be a suspect in the murder of Devan Duniver because there were no other suspects. She also mentioned that Harris had filed the instant civil suit against her. The Marine Corps subsequently declined to allow Harris to enlist, citing his continuing status as a suspect in the murder and the fact that his conviction had been reversed on a technicality.

In his Amended Complaint, Harris asserts claims for Fourth, Fifth, and Fourteenth Amendment violations and First Amendment retaliation, pursuant to 42 U.S.C. § 1983; a conspiracy to interfere with his civil rights, pursuant to 42 U.S.C. §1985; and Ohio state-law claims for aiding and abetting, malicious prosecution, defamation, and tortious interference with a prospective business relationship. After Harris settled his claims against all of the other defendants, Spies and Tuscarawas moved for summary judgment on all of his claims against them. On May 16, 2006, the

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

district court granted the motion, dismissing with prejudice all of Harris's claims.  Harris now appeals.

## II. JURISDICTION

The district court possessed jurisdiction over Harris's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Harris's state claims pursuant to 28 U.S.C. § 1367(a).  We have jurisdiction over Harris's appeal from the district court's final judgment pursuant to 28 U.S.C. § 1291.

## III. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing the absence of any genuine issues of material fact. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).  Once the movant has satisfied its burden, the nonmoving party must produce evidence showing that a genuine issue remains. *Id.*

The court must credit all evidence presented by the nonmoving party and draw all justifiable inferences in that party's favor. *Id.*  The nonmovant must, however, "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Summary judgment is proper when the nonmoving party has had adequate time for discovery and yet "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  We review a district court's grant of summary judgment de novo. *See, e.g.*, *Spencer v. Bouchard*, 449 F.3d 721, 727 (6th Cir. 2006).

### B. Immunity

#### 1. Absolute Immunity

In the district court, Spies argued that she was entitled to both absolute and qualified immunity for her alleged role in deciding that Harris should be arrested on the day of his confession.  The district court determined that Spies could not invoke absolute immunity, because she did not make the arrest decision within the scope of her role as an advocate, but that she was entitled to qualified immunity, because she reasonably concluded that probable cause existed to support the arrest.

"The analytical key to prosecutorial immunity . . . is advocacy—whether the actions in question are those of an advocate." *Skinner v. Govorchin*, 463 F.3d 518, 525 (6th Cir. 2006) (internal quotation marks omitted).  "If the challenged actions of the prosecutor were not performed in his role as advocate, if they do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings, then only qualified immunity applies." *Id.* (internal quotation marks and brackets omitted).  In other words, "[p]rosecutors are not absolutely immune . . . when they perform administrative, investigative, or other functions." *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) (en banc).

In *Ireland v. Tunis*, 113 F.3d 1435 (6th Cir.), *cert. denied*, 522 U.S. 996 (1997), we elaborated on the distinction between prosecutorial actions that are and those that are not protected by absolute immunity:

> Absolute prosecutorial immunity is justified "only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct." A prosecutor [is] therefore absolutely immune from suit for soliciting false testimony from witnesses and participating in a probable cause hearing that led to the issuance of a search warrant, *but not for giving legal advice to the police regarding the use of hypnosis as an investigative technique and the existence of probable cause to arrest.* For this latter type of prosecutorial activity, administrative or investigative acts unrelated to judicial proceedings, qualified immunity is all that is available.

*Id.* at 1445 (emphasis added) (internal citations omitted) (quoting *Burns v. Reed*, 500 U.S. 478, 494 (1991)).

Subsequently, in *Prince v. Hicks*, 198 F.3d 607 (6th Cir. 1999), we affirmed the denial of absolute immunity to a prosecutor who advised police that probable cause existed to arrest a suspect. In so holding, we relied upon the Supreme Court's opinion in *Burns v. Reed*, 500 U.S. 478 (1991).

> In *Burns*, two police officers investigating a shooting of two boys suspected that the mother had multiple personalities and may have been responsible for the crime. The two officers contacted the chief deputy prosecutor to inquire as to the legality of subjecting the mother to hypnosis. The prosecutor advised the police officers that they could proceed. After the hypnosis session, upon hearing the statements the mother had made, the prosecutor advised the officers that they "probably had probable cause" to arrest the mother. The Supreme Court held that "advising the police in the investigative phase of a criminal case is [not] so 'intimately associated with the judicial phase of the criminal process' that it qualifies for absolute immunity." The Court added, "it is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice."

*Prince*, 198 F.3d at 613 (internal citations omitted) (quoting *Burns*, 500 U.S. at 482, 493, 495).

In this case, Urban testified that he arrested Harris because Spies told him to, and that he had no input into the decision to make the arrest. J.A. at 560 (Urban Dep. at 540-41). As this testimony demonstrates, and as Spies does not deny,[5] Spies went beyond merely advising the police; she *instructed* them to arrest Harris, without soliciting any officer's opinion. Accordingly, the district court correctly determined that Spies was acting in an administrative or investigative capacity and is, therefore, not entitled to absolute immunity.

### 2. Qualified Immunity

The doctrine of qualified immunity precludes actions for damages against government officials on the basis of discretionary actions that do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc) (internal quotation marks omitted). We analyze claims of qualified immunity using a three-part test, which requires us to determine (1) whether a constitutional right was violated; (2) whether that right was clearly established and one of which a reasonable person would have known; and (3) whether the official's action was objectively unreasonable under the circumstances. *Id.* In other words, an arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was

---

[5] During her deposition, Spies claimed to be unable to recall whether or not she had ordered Harris's arrest, but did not dispute Urban's recollection that she had done so. J.A. at 964-66 (Spies Dep. at 1008-14).

lawful, in light of clearly established law and the information possessed at the time by the arresting agent. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

"The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *United States v. Romero*, 452 F.3d 610, 615-16 (6th Cir. 2006) (internal quotation marks omitted), *cert. denied*, 127 S. Ct. 1321 (2007). In determining whether an arrest is supported by probable cause, we look to the totality of the circumstances. *Id.* at 616. We consider only the information possessed by the arresting officer at the time of the arrest. *Id.* at 615; *see also Wolfe v. Perry*, 412 F.3d 707, 718-19 (6th Cir. 2005).

A finding of probable cause does not require evidence that is completely convincing or even evidence that would be admissible at trial; all that is required is that the evidence be sufficient to lead a reasonable officer to conclude that the arrestee has committed or is committing a crime. *United States v. Shaw*, 464 F.3d 615, 623 (6th Cir. 2006). A "mere suspicion of criminality," however, is insufficient to support a finding of probable cause. *Williams ex rel. Allen v. Cambridge Bd. of Educ.*, 370 F.3d 630, 637 (6th Cir. 2004) (internal quotation marks omitted).

In this case, the district court concluded that Spies had a reasonable basis for concluding that probable cause supported Harris's arrest, because Harris's confession was corroborated by "substantial evidence." J.A. at 177-78 (Dist. Ct. Mem. at 15-16). That evidence, according to the district court, included (1) Devan's aunt's report to the police that Harris had previously threatened Devan's life; (2) the fact that Harris was seen, near the time of Devan's disappearance, in the area where her body was later found; (3) the fact that Harris told the police five different stories concerning his whereabouts and route home on the day of Devan's disappearance; (4) Harris's prior physical altercation with Devan; (5) the confession itself; and (6) the subsequent recovery of a knife that was, for a time, suspected to be the murder weapon.[6] J.A. at 177-78 (Dist. Ct. Mem. at 15-16).

The district court erred, as a threshold matter, in concluding that Spies was free to consider any part of Harris's confession in determining whether probable cause supported his arrest. On the contrary, any reasonable prosecutor in Spies's position would have known, after listening to the tape of the confession, that it was involuntary as a matter of law and thus untrustworthy. First, as the Ohio appellate court held, any waiver of *Miranda* rights was rendered involuntary by Harris's age, lack of any previous criminal history or experience, and physical separation from his mother, in addition to the "intensity of the interview" conducted by Vaughn. *Harris*, 2000 WL 748087, at *11. More important, the techniques used by Vaughn in questioning a twelve-year-old child were coercive, irrespective of the effectiveness of the *Miranda* warning. *Id.* at *12.

In any event, Harris's attempts to give the answers demanded by Vaughn clearly demonstrated that Harris was unfamiliar with details of the crime that the perpetrator would have known. For instance, even after protracted coaxing and implicit threats by Vaughn, Harris could only guess at what Devan might do to make him (Harris) angry enough to hurt her: throw a rock at him, perhaps, or use profanity or racial invective toward him. J.A. at 82-84 (Suppression Hr'g Tr. at 273-75). When Vaughn continued to insist that Harris was guilty and again asked him why he had become angry at Devan, Harris eventually responded, "She hit me with a brick." J.A. at 87-88 (Suppression Hr'g Tr. at 278-79). Harris was referring, of course, to the prior incident when he had pushed or struck Devan after she threw a brick at him.

---

[6] While being interrogated by Vaughn, Harris stated that he had stabbed Devan with a pocketknife belonging to his friend Zack Ellwood. J.A. at 89-91 (Suppression Hr'g Tr. at 280-82). The police subsequently recovered a knife from Zack Ellwood's home. J.A. at 2404 (Detention Hr'g Tr. at 18). That knife was determined not to be the murder weapon, and no murder weapon has ever been found. J.A. at 622 (Urban Dep. at 784), 982 (Spies Dep. at 1078-79).

Vaughn, however, took Harris's reference to that incident as an admission of guilt and pressed for incriminating details, which Harris could not provide. When asked whether the murder weapon was a stick or a knife, Harris replied, "Probably a pocket knife." J.A. at 89 (Suppression Hr'g Tr. at 280). He denied knowing whose knife it was; pressed hard by Vaughn, he said that it belonged to a friend of his mother's "or something" and then stated that one of his own friends had it. *Id.* He went on to describe, again, the prior incident when he had pushed Devan after she threw a brick at him, noting that he had immediately told Devan's mother the truth about the incident. J.A. at 90 (Suppression Hr'g Tr. at 281).

When Vaughn continued to insist that Harris discuss the murder, and Vaughn made a series of guesses—that Devan had run from Harris in the woods, that Harris had caught her and then stabbed her in the throat with a pocket knife—Harris finally broke down and said "[y]es." *Id.* He continued, however, to give factual answers at odds with the known details of the crime. He stated that he did not know how many times he had stabbed Devan, denied that it was five or six times, and finally (after Vaughn suggested that it was "[o]nce or twice") said, "Probably twice."[7] J.A. at 90-91 (Suppression Hr'g Tr. at 281-82). He denied having gotten blood on his hands; when asked whether he had gotten blood on the pocket knife, he replied, "Probably a little."[8] J.A. at 91 (Suppression Hr'g Tr. at 282). Harris repeatedly stated that he didn't know or wasn't sure of the answers to Vaughn's questions. *Id.* When prodded by Vaughn to describe the pocket knife, Harris could not say whether the handle was black or silver, smooth or rough. J.A. at 96 (Suppression Hr'g Tr. at 287). Despite an extensive search, no murder weapon was ever found. J.A. at 981-82 (Spies Dep. at 1074-79).

When Vaughn asked Harris to write out his confession, Harris asked for his mother. As soon as she entered the room, Harris recanted his statement. Although his mother questioned him pointedly and at length, Harris remained adamant that he had not killed Devan, that his responses to Vaughn's questions had been guesses, and that he had confessed because he "was just scared" and "[s]ome of those questions were too hard." J.A. at 108-25 (Suppression Hr'g Tr. at 299-316).

Spies listened to the recording of Vaughn's interrogation of Harris as soon as she arrived at the police station and before she ordered Harris's arrest. J.A. at 559-60 (Urban Dep. at 536-40). Accordingly, she should have known that Harris's confession was suspect and inherently untrustworthy because it was extracted from a twelve-year-old child with no previous law-enforcement experience, outside the presence of his mother, through the use of intensive interrogation techniques. Thus, the district court erred in concluding that the confession provided support for Spies's finding of probable cause for the arrest. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964) (holding that whether an arrest is supported by probable cause turns upon "whether at [the moment of the arrest] the facts and circumstances within [the arresting official's] knowledge *and of which they had reasonably trustworthy information* were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense" (emphasis added)).

After the elimination of Harris's confession from consideration, an examination of the remaining record indicates that the district court improperly relied upon disputed facts in concluding that the information possessed by Spies supported her determination that probable cause existed to arrest Harris. *See, e.g.*, *Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005) ("If disputed factual issues underlying probable cause exist, those issues must be submitted to a jury for the jury to determine

---

[7] In fact, Devan was stabbed seven times. J.A. at 3832, 3837 (Trial Tr. at 1356, 1361).

[8] It is uncontroverted that Devan's carotid artery was partially severed, and, although the expert testimony presented at trial was not conclusive on the point, a pathologist employed by the Stark County Coroner's office testified on cross-examination by Harris's counsel that Devan probably lost a "profuse" amount of blood during the murder. J.A. at 3893-94 (Trial Tr. at 1417-18).

the appropriate facts."). One such alleged fact was that, "[s]uspiciously, [Harris] gave the police at least five different versions about where he was and the route he took home before finally admitting the truth." J.A. at 177 (Dist. Ct. Mem. at 15). The district court based this conclusion upon Urban's testimony, at Harris's subsequent detention hearing, that "I had about five stories I believe from Anthony on how he got home that day." J.A. at 2396 (Detention Hr'g Tr. at 9). According to Urban, Harris first told Devan's mother that he (1) had walked home from school that day, and later told Urban that he (2) had been dropped off in front of a friend's house (the "Eckert house") and had walked home from there; (3) had walked home from the Eckert house, taking a route between a fence and the wooded area where Devan's body was found, a route that Urban described as being east of the woods; (4) had walked home from the Eckert house via a route that took him west of the woods, near Robert's Plumbing; and (5) had walked home directly through the woods. J.A. at 2395-96 (Detention Hr'g Tr. at 8-9).

As an initial matter, we note that there is no indication that Spies was aware of this information at the time of Harris's arrest the day before the detention hearing, and thus the information should not have been considered in determining whether the arrest itself was supported by probable cause. *Hunter*, 502 U.S. at 227 (describing the relevant considerations as "clearly established law and the information the arresting officers possessed" (internal quotation marks and brackets omitted)). In any event, descriptions (1) and (2) are not inconsistent with any of accounts (3) through (5); it is undisputed that Harris went to school on the day of the murders and that he did arrive home on foot, notwithstanding an intervening stop at the Eckert house. Taking into consideration the fact that the declarant was a twelve-year-old child being questioned about the details of one instance of a routine event—his trip home from school—five days after the fact,[9] a reasonable official would not have drawn an adverse inference from such a minor discrepancy as the omission of a stop at a friend's house.

Moreover, a review of the audiotape of Urban's interview of Harris reveals that descriptions (3) and (4) were actually suggested by Urban, not Harris; Urban pointed to various spots on a map and suggested various routes that Harris had taken, to which Harris merely assented. J.A. at 2179, 2181-82 (Dep. Ex. 44 at 102, 104-05). Harris eventually himself provided description (5), by pointing at the map and describing the path that he had taken through the woods. J.A. at 2183 (Dep. Ex. 44 at 106). When Urban later asked why Harris had initially indicated that he had skirted the woods instead of walking through them, Harris responded, "because I always walk around that and that's where there's people around those houses." J.A. at 2202 (Dep. Ex. 44 at 125). Harris then reiterated that he was now certain that he had walked through the woods rather than around it on the day in question. *Id.* Again, viewed in context, these statements more likely indicate a twelve-year-old's confusion about which particular path he had followed on a specific day than a sense of guilt or an intent to deceive.

In addition, although it is true that a knife (though not the murder weapon) was found by police and awaiting testing by the time the post-hoc probable-cause *hearing* took place, no knife had yet been recovered at the time of Harris's *arrest*. J.A. at 561 (Urban Dep. at 544-45). Finally, although Harris admitted to having once engaged in a scuffle with Devan, Urban's testimony at the probable-cause hearing established that Harris did not attack Devan without provocation in that instance but, rather, knocked her down only after she threw a brick at him. J.A. at 2402 (Probable Cause Hr'g Tr. at 16) ("He told us that Devan had thrown a brick at him a week or two ago and that he had knocked her down and she had scraped herself up. That was the only other violence that I was aware of.").

---

[9] Devan disappeared on June 27, 1998; Urban's initial interview of Harris, which was conducted at Harris's home in the presence of Harris's mother, took place on July 2. J.A. at 685 (Dep. Ex. 45 at 246).

Thus, the only evidence properly considered by the district court in determining whether Harris's arrest[10] was supported by probable cause is (1) the fact that Harris was admittedly present, shortly after Devan's disappearance, in the wooded area where her body was later found; (2) the prior threat that he allegedly made against her; and (3) his previous act of striking or pushing her after she threw a brick at him. This evidence is insufficient to give rise to probable cause to arrest Harris for Devan's murder.

First, it is well-established that an individual's mere presence at a crime scene does not constitute probable cause for an arrest. *United States v. Castro-Gaxiola*, 479 F.3d 579, 583 (8th Cir. 2007); *Holmes v. Kucynda*, 321 F.3d 1069, 1081 (11th Cir. 2003); *United States v. Ingrao*, 897 F.2d 860, 863 (7th Cir. 1990); *United States v. Garcia*, 848 F.2d 58, 60 (4th Cir.), *cert. denied*, 488 U.S. 957 (1988); *United States v. Ashcroft*, 607 F.2d 1167, 1172 (5th Cir. 1979), *cert. denied*, 446 U.S. 966 (1980). Furthermore, the Supreme Court has made clear that a probable cause finding may not be based "upon information too vague and from too untested a source." *Wong Sun v. United States*, 371 U.S. 471, 482 (1963). In this case, the only evidence cited by Appellees in support of their assertion that Harris had threatened Devan consists of Urban's testimony that he was told by one of Devan's family members (described variously as either an aunt or a stepmother[11]) that Harris had, at some unspecified time and place, threatened to kill Devan. Appellees Br. at 4-5; J.A. at 493 (Urban Dep. at 276) ("It depends on where we're talking about on July 1st, because I think it was either the 30th or the first that I also received information that Anthony had threatened to kill Devan. And that increased my interest."), J.A. at 494 (Urban Dep. at 280) ("I think—I think my first information came from C.J. Duniver, which is a, I think his [sic] stepmother. . . . That Anthony had or that Devan had talked to her and said that Anthony had threatened to kill her."), J.A. at 2392 (Detention Hr'g Tr. at 5 (Urban Testimony)) ("I've learned that Devan had told her aunt, prior to being brought home that Saturday, that Anthony had threatened to kill her, and those were her words."). Both the vagueness of the information and the impossibility of determining, on the record, even the identity (to say nothing of the reliability) of the source preclude a finding of probable cause based upon this information.

Finally, the "prior act of violence" committed by Harris against Devan, Appellees Br. at 5, consisted of Harris's striking or pushing her in the arm after she threw a brick at him—an act to which Harris readily admitted and which he has described fairly consistently (and an event of which Devan's mother was aware). J.A. at 703 (Urban Dep., Ex. 45, at 264 (Tr. of July 2, 1998 Urban-Harris Conversation)) ("I just like, do you know her little brother Dylan just like, hit her back, I mean I just tapped her softly, she tripped over on her feet and the gravely [sic] and she cut her stomach, I just tapped her softly."), J.A. at 88-90 (Suppression Hr'g Tr. at 279-81 (Vaughn Interrogation Recording)) ("I pushed her and she fell over on some stone and she went in the house, told her mom, her mom like yelled at me. I told her exactly what happened. I told her the truth what happened, I pushed her by accident, she fell, cutting herself on some rocks."). This isolated squabble between neighbor children who often played together,[12] which apparently did not result

---

[10] Although Harris was transported to a juvenile center, not to an adult prison, the actions of the police nonetheless constitute an arrest. *See, e.g.*, *State v. Hanning*, 728 N.E.2d 1059, 1061-62 (Ohio 2000) (describing several differences between juvenile and adult criminal proceedings but referring to the apprehensions of juvenile as "arrests").

[11] Appellees' Brief attributes the statement to an aunt, without mentioning a stepmother. Appellees Br. at 4.

[12] *See* J.A. at 3282 (Trial Tr. at 811 (Lori Duniver Testimony)) ("Anthony and I had a very good relationship. . . . Just, all the kids kind of like played together. Anthony . . . and Dylan and Devan and Vincent . . . ."), J.A. at 3283 (Trial Tr. at 812) (stating that Devan and Anthony played together "[e]very day"), J.A. at 3287-88 (Trial Tr. at 816-17) ("The kids would just like—the kids were just like right here, you know, all the time. So it was like Anthony was always there, Michael was always sitting on what I would consider my front step . . . . Anthony was always there, the kids were always there.").

in any substantial injury to Devan, does not support a finding of probable cause to arrest Harris for Devan's murder.

Even considered cumulatively, this evidence indicates only that Harris and Devan, neighbors who played together every day, once had a squabble; that a purported relative of Devan's, whose precise identity is unknown, may have said that Harris had once threatened Devan; and that Harris was seen on the day of the murder in an area that he frequented every day. This evidence would not lead a reasonable officer to conclude that Harris had murdered Devan. Accordingly, we hold that Harris's arrest was unsupported by probable cause. Moreover, it was clearly established at the time of Harris's arrest that the Fourth Amendment requires every arrest to be supported by probable cause, *Donovan v. Thames*, 105 F.3d 291, 297-98 (6th Cir. 1997), and—for the reasons set forth above, and viewing the evidence in the light most favorable to Harris[13]—a reasonable official in Spies's position would not have concluded that there was probable cause to arrest Harris for Devan's murder. Accordingly, because the district court erred in concluding that Spies was entitled to qualified immunity, we **VACATE** the grant of summary judgment in favor of Spies on qualified-immunity grounds as to Harris's § 1983 claims.

## C.  Harris's *Brady* Claim

Harris next claims that Spies violated his right to the disclosure of exculpatory evidence in the government's possession, under *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Harris contends that Spies wrongfully and deliberately withheld evidence that Lori Duniver reported to police on the day of Devan's disappearance that she had seen a car resembling Redmond's in the neighborhood; a letter from Lori Duniver to a police officer mentioning that alleged report; and records of a public child-protection agency establishing that Redmond had beaten Devan with a belt and that Devan had stated that she was afraid of Redmond.

The district court concluded that Harris had forfeited his *Brady* claim when he failed to "seek to amend the complaint again and asserted this new cause of action for violation of his *Brady* rights for the first time in response to the [instant] motion for summary judgment." J.A. at 180-81 (Dist. Ct. Mem. at 18-19). The district court further determined that Harris's *Brady* claim was factually unsupported, because Harris "was aware of the essential facts that would enable him to take advantage of the exculpatory evidence" and should have known to check public records for such evidence. *Id.* at 181 (Dist. Ct. Mem. at 19).

We utilize a "'course of the proceedings' test to determine whether defendants in a § 1983 action have received notice of the plaintiff's claims where the complaint is ambiguous." *Cummings v. City of Akron*, 418 F.3d 676, 681 (6th Cir. 2005). The complaint in *Cummings* alleged violations of the Fourteenth Amendment and 42 U.S.C. § 1983, but we held that "statements made by both Cummings' counsel and Defendants' counsel during Cummings' deposition demonstrate[d] that both sides understood Cummings' suit to encompass Fourth Amendment claims" not explicitly set forth in the complaint, and we therefore addressed those claims on appeal. *Id.* Judge Griffin suggests in dissent that Harris's complaint wholly failed to plead a *Brady* claim and thus did not fall within the range of ambiguity contemplated by *Cummings*. Harris's *Brady* claim implicating the Due Process Clause of the Fourteenth Amendment, however, fell within the scope of the allegation in his complaint that the Defendants-Appellees "engaged in a pattern of activity and course of conduct that was intended to manufacture" Anthony's conviction "in violation of the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution." J.A. at 57 (Compl. at ¶ 122); J.A. at 152 (Amend. Compl. at ¶ 129). Accordingly, Harris, whose *Brady* claim lies within the scope of his pleaded Fourteenth Amendment claim, is in an even stronger position than the plaintiff in

---

[13] *See Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 310 (6th Cir. 2005).

*Cummings*, whose Fourth Amendment claim did not lie within the scope of the Fourteenth Amendment claim pleaded in his complaint. We thus determine that it is appropriate to follow the analysis established in *Cummings*.

Judge Griffin argues in dissent that the "course of the proceedings" exception to our pleading rules does not apply when the alleged notice arises during the course of a discovery deposition. Certainly, the breadth of discovery under Fed. R. Civ. P. 26(b)(1) and 32(d)(3)(A) allows questions designed to elicit admissible evidence, which at trial might be deemed irrelevant. The breadth of discovery, however, does not lead logically to Judge Griffin's conclusion that questions posed by plaintiff's counsel during depositions cannot put defendants on notice regarding a claim not specifically alleged in the complaint. This conclusion ignores the fact that the proceedings referred to in *Cummings* themselves involved a deposition. 418 F.3d at 681; *see also Torry v. Northrop Grumman Corp.*, 399 F.3d 876, 879 (7th Cir. 2005) (holding that a claim not alleged in the complaint "was (pre)tried by implied consent of the parties . . . [during] four years of discovery and other pretrial maneuverings").

The transcript of Spies's deposition indicates that all parties were aware, well before the summary judgment stage, that Harris's complaint encompassed a *Brady* claim:

Q:          Is that something that you would have found necessary to turn over to defense counsel in Anthony Harris' murder case?

A:          I don't believe so.

Q:          Even though it's in a finding or a report, of children's services[, documenting Redmond's kidnapping and physical abuse of Devan]?

A:          I don't believe so.

Q:          And can you explain to me why not?

\* \* \* \*

A:          Because it deals with an incident that occurred almost a year prior to this particular incident; it occurred in the Columbus area; it did involve Devan, and in my mind that's really the only similarity.
            It doesn't indicate to me, you know, did she get the bruises, whatever, when she was visiting dad? Did she get the bruises from Mr. Redmond? Did she get the bruises from Lori? Did she get them because her and her brother Dylan were roughhousing, and he grabbed the belt and hit her? I don't know that.

J.A. at 934 (Spies Dep. at 888-89); *see also* J.A. at 938-41 (Spies Dep. at 902-15). Harris's counsel asked Spies repeated questions concerning the potentially exculpatory evidence—Lori Duniver's report to the police regarding her sighting of a vehicle that resembled Redmond's car, Lori's letter to a police officer regarding the car, and the child-protection agency report—over a sustained period that produced over two-hundred transcript pages. J.A. at 895 *et seq.* (Spies Dep. at 730 *et seq.*) The transcript makes clear that Harris's counsel was not merely fishing for admissible evidence but rather laying the foundation for a *Brady* claim. Harris's counsel, in fact, specifically mentioned *Brady v. Maryland*, as well as the related cases *United States v. Agurs*, 427 U.S. 97 (1976), and *United States v. Giglio*, 405 U.S. 150 (1972), and suggested that Spies had violated her obligation under *Brady* to disclose exculpatory evidence. *See* J.A. at 898-900 (Spies Dep. at 744-53); J.A. at

927 (Spies Dep. at 860-61). Accordingly, the district court erred in concluding that Harris had forfeited this claim by failing to plead it with specificity.

The district court also erred in determining that Harris was on notice of the existence of the evidence. It is true that, under *Spirko v. Mitchell*, a prosecutor has no obligation to disclose information where "the evidence was available to [the defendant] from other sources than the state, and he was aware of the essential facts necessary for him to obtain that evidence." 368 F.3d 603, 611 (6th Cir. 2004), *cert. denied*, 544 U.S. 948 (2005). Here, however, there is no indication that Harris knew or had reason to know that Redmond had abused Devan or that Lori Duniver had reported seeing a car similar to the one used by Redmond in her neighborhood near the time of Devan's disappearance. Accordingly, because the district court granted summary judgment on improper grounds, we **VACATE** the grant of summary judgment in favor of Tuscarawas on Harris's *Brady* claim.

### D. Harris's Claim Under 42 U.S.C. § 1985

The district court granted summary judgment in favor of Spies and Tuscarawas on Harris's § 1985 claim that they conspired to deprive him of his constitutional rights. Harris does not address this claim on appeal. Accordingly, he has waived it. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 311 (6th Cir. 2005) ("[A party's] failure to raise an argument in his appellate brief constitutes a waiver of the argument on appeal.").

### E. First-Amendment Retaliation

Harris alleges that Spies's statements to the Marine Corps recruiters were motivated by a desire to retaliate against him for filing the instant suit.

> In order to prove a claim for retaliation, a plaintiff must establish the following elements: (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998). The district court concluded that Harris could establish neither the second nor the third element of his claim.

With regard to the second element—adverse action—the district court determined that, because the Marine Corps denied Harris's application "based upon the determination that his conviction was reversed on a technicality" and because, "[i]n the eyes of the Marines, the suppression of the plaintiff's confession by the state appellate court did not negate its existence," Spies's statement did not cause Harris's injury. J.A. at 184 (Dist. Ct. Mem. at 22).

The record, however, demonstrates that Spies's comments deterred the Marine Corps from proceeding with Harris's application for employment:

> Q:          If you had obtained the letter from the prosecutor in Anthony's case that said in substance that Anthony had been wrongfully convicted of murder, and that there was no probable cause that Anthony had committed the murder, would that have been sufficient for you to pursue . . . his application?

> MR. CLEARY: Objection.

A:          I would also have to have something saying that he was not undergoing any further court action.  If that was included in it, I would favorably endorse it to go to my next higher level; but because of the severity of the charge, I could not sign off and approve that waiver.

Q:          So the fact that the prosecutor in this case said just the opposite[,] that he would always be a suspect, was significant to you in terms of not pursuing the waiver process, right?

MR. CLEARY:  Objection.

A:          Yes.

Q:          And that was why you didn't pursue it, is that right?

MR CLEARY:  Objection.

A:          Correct.

J.A. at 1426 (Gonzalez Dep. at 23-24).

The district court also noted that Spies's actions "did not stop the plaintiff from proceeding with this civil suit." J.A. at 184 (Dist. Ct. Mem. at 22).  That is not, however, the relevant question. "First, the issue is whether a person of ordinary firmness would be deterred, not whether [the plaintiff] himself actually was deterred." *Thomas v. Eby*, 481 F.3d 434, 441 (6th Cir. 2007). "Second, if subsequently challenging [the state action] *ipso facto* demonstrated that the challenged action was not sufficiently adverse to undermine constitutional rights, no case alleging retaliation for exercising First Amendment rights could ever be brought." *Id.*

Spies's action would likely deter a person of ordinary firmness from pursuing a claim against the government.  Harris is obviously aware that his conviction of and incarceration for a notorious crime will likely always concern potential employers.  Moreover, Spies's aggressive attempt to convince one such employer of Harris's guilt has actually prevented Harris from securing the career that he wants.  A more effective deterrent is difficult to imagine.  Accordingly, Harris has satisfied his burden with regard to the second element.[14]

As for the third, or causation, element of the prima facie case, the district court stated only that "[t]he statement of Ms. Spies to the Marine Corps recruiter was motivated by the strength of her belief and her desire to provide accurate information, rather than any attempt to intimidate the plaintiff into abandoning the case at bar." J.A. at 185 (Dist. Ct. Mem. at 23).  In so concluding, the district court appears to have ignored the evidence that Spies referred explicitly to the instant lawsuit in her communications with the recruiters.

"Usually, the question of causation is a factual issue to be resolved by a jury, and may be satisfied by circumstantial evidence." *Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996) (internal citation omitted), *cert. denied*, 519 U.S. 1055 (1997).  Here, Spies's mention of Harris's civil suit during the course of her conversation with the recruiters constitutes powerful circumstantial evidence that her other remarks were motivated by retaliatory animus.  Accordingly, because a

---

[14] The district court mentioned, seemingly in passing, that "[t]he information provided by Ms. Spies (in response to a government inquiry) was truthful.  Anthony Harris is still a suspect in the murder of Devan Duniver." J.A. at 184 (Dist. Ct. Mem. at 22).  However, "[t]he law is well established that an act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *Greene v. Barber*, 310 F.3d 889, 895 (6th Cir. 2002) (internal quotation marks and brackets omitted).

genuine issue of material fact exists with regard to Harris's retaliation claim, we therefore **REVERSE** the district court's grant of summary judgment in favor of the defendants on that claim.

## F. Aiding and Abetting

The district court granted summary judgment in favor of the defendants on Harris's aiding-and-abetting claim. Harris does not address the issue in his briefs on appeal, and accordingly he has waived the claim. *Radvansky*, 395 F.3d at 311.

## G. Malicious Prosecution

"Ohio has set forth the elements of a malicious prosecution claim as follows: (1) malice in instituting (or continuing) the prosecution, (2) lack of probable cause, and (3) termination of the action in favor of the defendant." *Swiecicki v. Delgado*, 463 F.3d 489, 503 (6th Cir. 2006) (citing *Trussell v. Gen. Motors Corp.*, 559 N.E.2d 732, 735 (Ohio 1990)). In this case, the district court concluded that "the plaintiff's confession alone provided probable cause to initiate and pursue the criminal charge against him," J.A. at 186 (Dist. Ct. Mem. at 24), and, moreover, that "there was substantial evidence to corroborate the plaintiff's confession," J.A. at 187 (Dist. Ct. Mem. at 25).

The Ohio courts define probable cause for the purposes of a malicious prosecution claim as "a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious [individual] in the belief that the person accused is guilty of the offense with which he [or she] is charged." *Rogers v. Barbera*, 164 N.E.2d 162, 166 (Ohio 1960) (quoting *Ash v. Marlow*, 20 Ohio 119 (1851)). For the same reasons that we determined Harris demonstrated that his arrest was unsupported by probable cause under federal law, we also find a lack of probable cause under the above Ohio state definition. The Ohio courts have further held, however, that

> a finding of guilty of a criminal offense by a court having jurisdiction to try and dispose of the case, *even though later and finally reversed by a reviewing court*, raises a conclusive presumption of probable cause and constitutes a complete defense in a later action for malicious prosecution brought by the defendant in the criminal case against the instigator thereof.

*Vesey v. Connally*, 175 N.E.2d 876, 878 (Oh. Ct. App. 1960) (emphasis added), *cited in Tilberry v. McIntyre*, 433 N.E.2d 636, 641 (Oh. Ct. App. 1999). "Nevertheless, fraud or unlawful means in securing a conviction which is subsequently reversed on appeal may be shown for the purpose of negativing the existence of probable cause as shown by the conviction." *Vesey*, 175 N.E.2d at 878.

> In general, [then,] throughout the United States, where the complaint on its face shows that [the] plaintiff in an action for malicious prosecution was, in the prosecution complained of, convicted in a lower court, although such conviction was subsequently dismissed by a court of superior jurisdiction, the action will be defeated unless plaintiff alleges and proves further facts tending to impeach the validity of the judgment of conviction and the presumption of probable cause arising therefrom, such as the fact that the conviction was brought about by fraudulent or perjured testimony or through undue or unfair means employed by defendant in the malicious prosecution action, a mere allegation of lack of probable cause being insufficient.

*Id.* at 878-79. Subsequent Ohio decisions confirm that when a conviction gives rise to a presumption of probable cause under *Vesey*, the court hearing a § 1983 claim must "search[] the record to determine whether . . . [the] conviction[] [was] secured by fraud or unlawful means." *Courtney v. Rice*, 546 N.E.2d 461, 465 (Oh. Ct. App. 1988).

Neither we nor the Ohio courts have previously decided whether a *Brady* violation suffices to trigger the "undue or unfair means" exception to the Ohio probable-cause presumption, and other federal courts applying similar state laws have disagreed on the issue. *Compare Walker v. Tyler County Comm'n*, 11 F. App'x 270, 275 (4th Cir. 2001) (unpublished) (rejecting a malicious-prosecution claim brought pursuant to West Virginia law only because the evidence of the underlying *Brady* violation was not based upon personal knowledge and the plaintiffs had thus failed to prove "that the defendants used fraud or other unfair means to obtain [a] conviction"), *with Ware v. United States*, 971 F. Supp. 1442, 1465-66 (M.D. Fla. 1997) ("Make no mistake about it, the prosecution breached its constitutional obligation to disclose the fingerprint report to Ware. However, this breach was remedied by Judge Castagna when he vacated Ware's conviction and granted him a new trial. . . . [I]t did not affect the presumption of probable cause.").

We have previously held that a *Brady* violation may rise to the level of fraud on the court under circumstances similar to those alleged here. In *Demjanjuk v. Petrovsky*, 10 F.3d 338 (6th Cir. 1993), we held that the prosecutors, in failing to read reports in their possession that turned out to be exculpatory, "acted with reckless disregard for the truth and for the government's obligation to take no steps that prevent an adversary from presenting his case fully and fairly." *Id.* at 351-54. "This was fraud on the court in the circumstances of this case where, by recklessly assuming Demjanjuk's guilt, they failed to observe their obligation to produce exculpatory materials requested by Demjanjuk." *Id.* at 354. Similarly, in this case, Harris claims that Spies failed to provide him with evidence that another potential suspect had been present in Devan's neighborhood near the time of her disappearance. Indeed, the defendants do not argue that Spies did not possess the information or that she disclosed it to Harris before trial. Accordingly, Harris has alleged facts and provided evidence sufficient to satisfy the second element of a prima facie case of malicious prosecution.

Ohio law defines "malice" as "an improper purpose, or any purpose other than the legitimate interest of bringing an offender to justice." *Criss v. Springfield Twp.*, 564 N.E.2d 440, 443 (Ohio 1990). "[I]f the lack of probable cause is demonstrated, the legal inference may be drawn that the proceedings were actuated by malice." *Thacker v. City of Columbus*, 328 F.3d 244, 261 (6th Cir. 2003) (internal quotation marks omitted); *see also Criss*, 564 at 443 (Ohio 1990) ("If the basis for prosecution cannot be shown, those who made the decision will appear to have acted with no basis—that is maliciously."). Because the prosecution lacked probable cause we draw an inference of malice, and conclude that Harris has satisfied the first element of the prima facie case. Finally, Harris's conviction was reversed on direct appeal, thus terminating the action in his favor. Accordingly, because Harris has established that a genuine issue of material fact exists as to his malicious-prosecution claim, we **REVERSE** the district court's grant of summary judgment in favor of the defendants on that claim.

## H. Defamation

Under Ohio law, the elements of a defamation claim, whether libel or slander, are "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc.*, 611 N.E.2d 955, 962 (Ohio Ct. App. 1992) (internal quotation marks omitted). "Because the determination of whether words are defamatory is a question of law, summary judgment is appropriate in defamation actions." *Brown v. Lawson*, 863 N.E.2d 215, 219 (Ohio Ct. App. 2006).

The district court in this case concluded that Spies's statement at the press conference—"In my heart and in my gut, I feel that Anthony Harris is responsible for the murder of Devan Duniver"—did not constitute defamation because it was a protected statement of opinion. The

district court further concluded that Spies's statements to the recruiters could not constitute defamation because they were truthful.

Expressions of opinion are protected under the Ohio Constitution and therefore cannot constitute defamation under state law. *Vail v. Plain Dealer Publ'g Co.*, 649 N.E.2d 182, 185 (Ohio 1995), *cert. denied*, 516 U.S. 1043 (1996). In determining whether a statement is an expression of opinion, the Ohio courts use a totality-of-the-circumstances test mandating the consideration of "the specific language used, whether the statement is verifiable, the general context of the statement, and finally, the broader context in which the statement appeared." *Id.*

The Supreme Court has held that "expressions of 'opinion' may often imply an assertion of objective fact." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990). For example, "[i]f a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth." *Id.* We have characterized such a statement as a "mixed" expression of opinion, "which may . . . be the basis for an action for defamation, since it implies the allegation of undisclosed defamatory facts as the basis for the opinion." *Falls v. Sporting News Publ'g Co.*, 834 F.2d 611, 615 (6th Cir. 1987), *cited in Webster v. United Auto Workers, Local 51*, 394 F.3d 436 (6th Cir.), *cert. denied*, 126 S. Ct. 421 (2005).[15] We have explained the respective functions of the judge and jury as follows:

> It is the function of the court to determine whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct, and the function of the jury to determine whether that meaning was attributed to it by the recipient of the communication.

*Falls*, 834 F.2d at 615-16.

Under the circumstances in which it was made, Spies's statement at the press conference was a mixed statement of opinion sufficient to give rise to a defamation claim. Spies made the statement during the workday, in a public venue, during an appearance at which she was accompanied by her second-in-command in the county prosecutor's office. All of these elements combined to imply that her statement was based upon facts not known to the general public. Accordingly, it is the province of a jury to determine whether the Marine Corps recruiters to whom the statements were made interpreted them as based upon such implied facts.

The district court also erred in concluding that Spies's statements to the recruiters were true and thus could not constitute defamation. Spies's statement that Harris would always be a suspect because there are no other suspects is directly contradicted by Urban's deposition testimony. Accordingly, because genuine issues of material fact persist with regard to Harris's defamation claim, we **REVERSE** the district court's grant of summary judgment in favor of Spies as to that claim.

## I. Tortious Interference With a Prospective Business Relationship

Finally, Harris claims that Spies's statements to the recruiters tortiously interfered with his prospective employment relationship with the Marine Corps. Under Ohio law, "[t]he tort of interference with a business relationship occurs when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relationship with another." *McConnell v. Hunt Sports Enters.*, 725 N.E.2d 1193, 1216 (Ohio Ct. App. 1999).

---

[15] The defamation claim asserted in *Falls* arose under Michigan, not Ohio, law. 834 F.2d at 614-15. The elements of defamation are, however, the same in both states. *Id.*

"The elements of tortious interference with a business relationship are (1) a business relationship, (2) the wrongdoer's knowledge thereof, (3) an intentional interference causing a breach or termination of the relationship, and (4) damages resulting therefrom." *Id.* The district court in this case determined that Spies's comments were not the cause of the Marine Corps's rejection of Harris's application and that the record-check release form signed by Harris authorized Spies's statements.

As explained above, in our discussion of Harris's First Amendment retaliation claim, the district court's conclusion that Spies's comments did not dissuade the Marines from enlisting Harris was error. Moreover, there is no evidence that the release form authorized Spies to do more than provide copies of paper records concerning the case, much less that her profane exclamation, gratuitous reference to the instant suit, and general hostility toward the recruiters and the idea of Harris's admission to the armed forces were contemplated by Harris or the Marine Corps when Harris was asked and agreed to execute the release. Accordingly, because a genuine issue of material fact persists with regard to Harris's tortious-interference claim, we **REVERSE** the district court's grant of summary judgment in favor of Spies as to that claim.

## IV. CONCLUSION

For the reasons set forth above, we **VACATE** the district court's grant of summary judgment in favor of the defendants on Harris's § 1983 and *Brady* claims, **REVERSE** the grant of summary judgment on Harris's First Amendment retaliation, defamation, and tortious-interference claims, **AFFIRM** the grant of summary judgment as to all of Harris's other claims, and **REMAND** this case to the district court for further proceedings in accordance with this opinion.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

GRIFFIN, Circuit Judge, concurring in part and dissenting in part. I respectfully dissent regarding the reversal of the district court's grant of summary judgment in favor of defendants on plaintiff's claims of unlawful arrest (III B 2); violation of *Brady*[1] (III C); and malicious prosecution (III G). On the remaining issues, I concur and join in the majority opinion.

I.

I agree with the majority and the district court that, based upon the present factual record, prosecutor Spies was not entitled to summary judgment on her defense of absolute immunity. However, I respectfully disagree with the majority and agree with the district court that Spies was entitled to summary judgment in her favor on her defense of qualified immunity.

An arresting agent is entitled to qualified immunity "if a reasonable officer could have believed [the] arrest to be lawful, in light of clearly established law and the information the arresting officers possessed." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (internal quotation marks and brackets omitted). "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Id.* (internal quotation marks omitted). "Immunity ordinarily should be decided by the court long before trial. . . . [T]he court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed . . . years after the fact." *Id.* at 228.

"The substance of all the definitions of probable cause is a reasonable ground of belief of guilt." *United States v. Romero*, 452 F.3d 610, 615-16 (6th Cir. 2006), *cert. denied* 127 S. Ct. 1321 (2007). "When determining whether an arrest was supported by probable cause, we utilize a totality-of-the-circumstances approach." *Id.* at 616 (internal quotation omitted). "The standard of probable cause does not require indubitable or necessarily convincing evidence, but only so much reasonably trustworthy information as to warrant a prudent man in believing that the arrestee has committed or is committing an offense." *United States v. Shaw*, 464 F.3d 615, 623 (6th Cir. 2006) (internal citation and quotations omitted). "[A] finding of probable cause may rest upon evidence which is not legally competent in a criminal trial." *Id.* (internal quotation marks omitted). In fact, "the probable cause requirement does not require that [police] possess evidence sufficient to establish [even] a prima facie case of guilt at trial. . . ." *Romero*, 452 F.3d at 616 (internal quotation marks omitted).

In the present case, the district court ruled that, "[a]t the time the plaintiff was arrested and charged, there was a reasonable basis to conclude that probable cause existed." In support of its finding, the district court stated that "there was . . . substantial evidence to corroborate [Harris's] confession":

> Devan's aunt knew about and informed authorities about the prior threat the plaintiff had made on Devan's life. It was corroborated that the plaintiff was walking alone coming home from a friend's house around the time Devan disappeared. In fact, he had been seen entering the wooded area where Devan's body was found just near the time that Devan was last seen, heading for that wooded area. Suspiciously, the

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

plaintiff gave the police at least five different versions about where he was and the route he took home before finally admitting the truth. Anthony Harris admitted to a prior act of violence against Devan. Furthermore, the plaintiff confessed that the murder weapon was a knife owned by a friend of his. A knife was recovered and, at the time probable cause was determined, was awaiting transportation to the lab for analysis.

Although the district court erred in considering Harris's confession and the knife, the remaining evidence cited by the district court was sufficient to constitute probable cause for the arrest. Under the totality-of-the-circumstance, I conclude that the combination of the following evidence was sufficient to establish probable cause for the arrest: (1) Harris had threatened to kill the victim; (2) shortly after the homicide, Harris was seen in the wooded area near the victim's body; (3) Harris gave conflicting explanations regarding his whereabouts at the time of the killing; and (4) Harris had previously assaulted the victim. Although the record indicates that other individuals might also be suspects, in my view, the evidence relating to Harris, considered in its totality, was sufficient to cause a reasonable officer to believe that Harris had committed the homicide. Such a belief need not be correct to be reasonable. *Hunter*, 502 U.S. at 227.

II.

Next, regarding the alleged *Brady* violation, the majority opinion acknowledges that plaintiff's amended complaint does not plead a claim based upon a violation of *Brady v. Maryland*. Furthermore, it concedes that, in opposing defendants' motion for summary judgment, plaintiff did not move to amend his complaint to assert a *Brady* claim. Nonetheless, the majority reverses the summary judgment granted in favor of defendants on this unplead claim based upon the "course of proceedings" exception to our notice-pleading requirement. I respectfully disagree.

Our Federal Rules of Civil Procedure require the plaintiff to plead with specificity only a small class of cases. For instance, claims based upon fraud or mistake must be alleged with particularity. FED. R. CIV. P. 9(b). Regarding all other claims, the plaintiff must state sufficient facts to place the defendant on notice of the claims asserted against him by pleading "a short and plain statement of the claim showing that the pleader is entitled to relief. . . ." FED. R. CIV. P. 8(a)(2) (in pertinent part).

The majority opinion cites nothing contained in the amended complaint that would place defendants on notice of plaintiff's *Brady* claim. Instead, Judge Moore relies on the "course of the proceedings" exception to our pleading rules. Under this exception, claims that are tried by the mutual consent of the parties are treated as if they were pleaded. In the present case, the error of using this exception is that the alleged notice of the claim arises from questions posed at a discovery deposition. Under our rules, discovery is broad: "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated *to lead to the discovery of admissible evidence*." FED. R. CIV. P. 26(b)(1) (in pertinent part; emphasis added).

Objections regarding the lack of relevancy of questions need not be raised at the time of the deposition:

> Objections to the competency of a witness or to the competency, relevancy, or materiality of testimony are not waived by failure to make them before or during the taking of the deposition, unless the ground of the objection is one which might have been obviated or removed if presented at that time.

FED. R. CIV. P. 32(d)(3)(A).

Further, despite the lack of relevancy of the questions to the claims asserted, absent a privilege or protective order, a deponent must answer questions posed at a discovery deposition: "A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion under Rule 30(d)(4)." FED. R. CIV. P. 30(d)(1) (in pertinent part).

Unlike *Cummings v. City of Akron*, 418 F.3d 676, 681 (6th Cir. 2005), the amended complaint is not "ambiguous" regarding the claim at issue. Moreover, "[t]aken as a whole" the amended complaint did not provide defendants with notice of an alleged *Brady* claim. *Cf. Moore v. City of Harriman*, 272 F.3d 769, 773 (6th Cir. 2001). Further, there is no indication by the questions themselves that the parties consented to the adjudication of a *Brady* claim. On the contrary, it is reasonable to believe that both counsel assumed that the deposition questions and their answers *might lead* to relevant evidence. In such an event, plaintiff would decide later whether to assert a *Brady* claim based upon the information learned through discovery. If plaintiff chose to sue for such a claim, defendants could reasonably expect notice by a motion to amend and an opportunity to be heard. Questions posed at discovery depositions are often far-ranging. Most importantly, the fundamental tenets of procedural due process counsel against liberally creating claims *by implication* from the asking of discovery questions. *See generally, Mullane v. Central Hanover Trust*, 339 U.S. 306, 313 (1950) ("Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.").

For these reasons, the district court did not err in granting summary judgment in favor of defendants on plaintiff's unplead *Brady* claim.

### III.

Finally, I respectfully dissent from the reversal of the grant of summary judgment in defendants' favor on plaintiff's malicious prosecution claim. In *Swiecicki v. Delgado*, 463 F.3d 489 (6th Cir. 2006), we observed that Ohio requires three necessary elements for a malicious prosecution claim: "(1) malice in instituting (or continuing) the prosecution, (2) lack of probable cause, and (3) termination of the action in favor of the defendant." *Id.* at 503 (citing *Trussell v. General Motors Corp.*, 559 N.E.2d 732, 735 (Ohio 1990)).

In the present case, although the district court erred in considering Harris's confession and the knife, the other evidence connecting Harris to the crime, as discussed above, was sufficient to give rise to probable cause for prosecution. For this reason, plaintiff's malicious prosecution claim fails.

In addition, as the Ohio Court of Appeals held in *Vesey v. Connally*, 175 N.E.2d 876 (Oh. Ct. App. 1960):

> a finding of guilty of a criminal offense by a court having jurisdiction to try and dispose of the case, *even though later and finally reversed by a reviewing court*, raises a conclusive presumption of probable cause and constitutes a complete defense in a later action for malicious prosecution brought by the defendant in the criminal case against the instigator thereof.

*Id.* at 878 (emphasis added). *See also Tilberry v. McIntyre*, 733 N.E. 2d 636, 641 (Oh. Ct. App. 1999).

Here, by operation of Ohio law, the guilty verdict rendered by the trier of fact constitutes a conclusive presumption of probable cause and a complete defense to plaintiff's malicious

prosecution claim.  The majority opinion cites no Ohio authority to the contrary.  Further, although Judge Moore assumes a *Brady* violation exception to Ohio's "*conclusive* presumption" of probable cause, as detailed above, plaintiff's amended complaint fails to plead facts in support of a *Brady* claim.

IV.

For these reasons, I respectfully concur in part and dissent in part.